## MARY J. BOIES, adm'x of WILLIAM H. BOIES, dec'd,

### *v.*

## ADAM K. HENNEY.

1. RECORD IN SUPREME COURT—*of modified instructions.* To enable the Supreme Court to pass upon the propriety of modified instructions, the instructions as asked should be before the court, and also the modifications as made by the court below.

2. FRAUDULENT CONVEYANCES. Every sale, assignment or conveyance of property made by the parties to it, with intent to hinder, defraud or delay creditors existing at the time, as to the collection of their debts, is void as to such creditors, whether such sale, assignment or conveyance was made with or without a valuable consideration therefor.

3. EVIDENCE OF FRAUD. Where a party, who owned a farm, gave a lease upon the same, providing for the raising, and preparing for market, of broom corn brush, and, while being indebted, assigned his lease, the fact that the assignee had notice at the time of the assignment, that his assignor was then indebted to a party whom he wished and intended to postpone, delay or hinder; that the assignment was without any actual consideration; that the assignee employed the assignor in connection with the property assigned, are circumstances to be considered by a jury as tending to show an intent on the part both of the assignor and the assignee of the lease to hinder, delay and defraud the creditor of the former.

Boies, Administratrix, &c., v. Henney.

4. And where such assignee afterwards made an assignment of the lease to another party, the fact that such assignment was without consideration, or for a consideration furnished by the original lessor; the application of the proceeds from the farm to the payment of other debts of such lessor; his acts showing a personal interest in the property covered by the assignment, at and after the time when it was made, and the like; with notice to the last assignee of the existence of the debt owing by the first assignor, and which he desired to delay and hinder; and of the interest of the first and second assignors thereby to hinder, delay or defraud said creditor, are circumstances to be considered by a jury as tending to show such intent on the part of the parties to such last assignment.

5. FRAUD — to "*postpone*" a creditor. Although the word "postpone" is not used in our statute of frauds in relation to conveyances, &c., made with intent to hinder and delay creditors, yet, taking the word as synonymous with delay, its use in an instruction in such connection would not be regarded as exceptionable.

6. WHO IS A CREDITOR — *statute of frauds.* One who, at the time of a transfer of property, made with intent to defraud creditors, had recovered a judgment against the party making such transfer, which was then or afterwards taken by appeal to the supreme court, and judgment afterwards again rendered in the circuit court on the proceedings had in the supreme court, would be such a creditor as to entitle him to take advantage of such fraudulent transfer.

7. KNOWLEDGE OF FRAUD — *by purchaser.* Where a transfer of property is made with the intent on the part of the one making the transfer to hinder, delay and defraud his creditors, and the party to whom the transfer was made had knowledge of facts and circumstances from which such intent was reasonably and necessarily inferable, then such transfer is fraudulent and void as against the rights of such creditors.

8. REBUTTING EVIDENCE. Testimony is not regarded as rebutting in its character unless it have reference to some new question raised by the evidence of the opposite party.

APPEAL from the Circuit Court of Henry county; the Hon. IRA O. WILKINSON, Judge, presiding.

The pleadings and evidence in this cause are sufficiently set forth in the opinion of the court.

Messrs. T. G. FROST and H. BIGELOW for the appellant.

Mr. J. J. BENNETT for the appellee.

Mr. JUSTICE BREESE delivered the opinion of the Court:

This was an action of replevin brought in the Henry Circuit Court, by the intestate of appellant, for a quantity of broom

corn brush. The defendant pleaded *non cepit* and five special pleas, the first averring a seizure of the property, as sheriff, on an execution issued on a judgment in favor of Oloff Johnson against George Farr, and that it was the property of Farr; the second averring that the corn brush was the property of George Farr and not the property of the plaintiff; the third, that the property was the property of Oloff Johnson and not the property of the plaintiff; the fourth, that the goods and chattels mentioned were the goods and chattels of George Farr, Peter Peterson, Peter Gibson and John Lind, and not the property of the plaintiff; and the fifth plea was *non detinet*.

The first special pleas were all traversed, and issue joined upon them, which were tried by a jury, who found them for the defendant. A motion was made for a new trial, which was overruled, and exception taken, and the case brought here by appeal.

We do not consider it necessary to notice all the errors assigned, as the case is made to turn here, principally upon the question of fraud in the transactions between Farr, Wells and Boies, out of which the action arose, the appellant affirming, and appellee denying they were fair and honest.

A brief statement of the leading facts will show how the question of fraud arose.

It appears that Oloff Johnson had, on November 30, 1859, obtained an award of arbitrators in his favor, against Farr, on which he brought suit and recovered a judgment in the Henry Circuit Court, on the 31st October, 1860. Farr appealed from the judgment to this court, where such proceedings were had, that May 17, 1861, the cause was remanded to the Circuit Court and final judgment there entered up against Farr, on the 5th of March, 1862. Pending the proceedings, Farr, on the 16th of January, 1861, entered into a contract with Peter Peterson, John Lind and Peter Gibson, whereby Farr leased to them, for the term of two years, 295 acres of land, besides personal property. The land was described as S. W. 33, T. 14 N., range 4 east, and 135 acres on section 33, in the same township and range, " now occupied by said Farr," the broom corn

sheds and machinery for scraping and bailing broom corn, viz., four scrapers, one eight horse power, two presses, with slats for drying brush on, being the entire fixtures for scraping and preparing for market, and the same used by Farr in 1860. The lease stipulates that the land all must be in broom corn; one-third of the crop was to be the property of Farr, "his heirs or assigns," to be delivered to him, his heirs or assigns, well scraped, thoroughly dried and in good shipping order. Farr agreed he would, or in case of assignment of the lease, his assignee should leave to the lessees, at the time of cutting and preparing the brush for market, the necessary money for paying the hired hands, for which he, or his assignee, in case of assignment, was to receive ten per cent. per annum, as interest thereon. Farr, or in case of assignment, his assignee, was to pay the lessees seventy-five dollars per ton for the other two-thirds of the brush to be delivered to Farr on or before the 15th day of October of each year, or as soon thereafter as it could be prepared for market, or in case of assignment, to his assignee, and it is expressly stipulated that this two-thirds "shall be sold to Farr or his assignee, upon the above terms, in any event." The money loaned by Farr to pay hired hands, or by his assignee in case of assignment, together with the interest thereon, was to be applied in payment of this two-thirds, and the balance which might be due should be paid by Farr, or in case of assignment then by his assignees, in certain specified installments. It was agreed all the obligations should be reciprocally binding upon both parties, and to be enforced separately for each year. Farr was to put the machinery in good repair, to be returned to him in like repair. It was further mutually agreed that "in case the said Farr shall assign this lease, it shall be in force between his assignee and the said parties of the second part, and the said assignee shall hereby be obligated in like manner and with like effect as the said Farr would be were this not assigned, and the said parties of the second part hereby ratify this contract with any such assignee or assignees, without or with notice from the said Farr, previ-

ously given to them as to whom the same may and shall be assigned."

The lease was assigned by Farr to F. C. Wells, on the 19th of April, 1861, and by Wells to the deceased, Boies, on the 2d day of June, 1862. On the 28th of August, 1862, Boies assigned the lease to A. J. Rockafellow, as collateral security for a note of $636, executed to him by Boies, and payable in ninety days.

About one month before the ninety days had expired, namely, on the 21st of October, 1862, Rockafellow made this indorsement on the lease: "Having received payment in full of the note specified in the foregoing assignment of W. H. Boies to me, I hereby, in consideration thereof, and for value received, reassign and transfer said lease to said Boies, and release and discharge all my lien thereon and right thereto."

F. C. Wells, the witness who proved the execution of the lease and the several assignments, testified, on cross-examination, that the lease was not assigned to him at the time the assignment bears date, but about the first of May thereafter. It had previously been assigned to parties at the east, creditors of Farr, who refused to receive it, and it was returned to Farr, and a part of the assignment stricken out and his name inserted, the date not having been altered. He gave no consideration for the assignment other than assuming the responsibilities of the lease. He resided, at the time the lease was assigned to him, and now resides at Chicago, and was in the employment of Wadsworth & Wells.

It was in testimony by Peter Peterson, that broom corn was raised on the land by him and Lind and Gibson; that Boies advanced the money on that year's crop; he paid it as they wanted it; they delivered thirty-nine bales of the corn, being the third of the crop, at the railroad company's warehouse in Galva; Boies had paid them about $1,200 on the contract. On his cross-examination he stated that it was delivered to Boies, because he advanced the money and had the contract, and he knew nobody else to whom to deliver it; he first learned that Boies bought the contract the 2d or 3d of June

last; it was at his house and he knew it; Boies and Farr were there on the 2d of June, and this lease, and he presumes it was assigned to Boies there; Wells was to be out of it because he had so much business to do; the arrangement (assignment) was on the contract, and he saw it when Farr and Boies came to his house; Boies paid to them fifty dollars, the day he was there; did not know Boies, so Farr came with Boies; they relied on Farr to inform them of Boies' responsibility; Farr recommended him; Farr has been in Chicago, and not in Boies' office for about four weeks past; they thought Boies would fulfill the contract, and he did so, and paid them the money, and that was all they asked him to do; Farr did not come again after that, and they had no transactions with him then, as to the contract; he has seen Farr in Boies' office.

It was admitted by defendant that the thirty-nine bales of brush replevied, were delivered to the plaintiff at the warehouse of the railroad company in Galva, and that the agent of the company had, prior to the 10th day of September, 1862, loaded car No. 739 with thirty bales of the brush, and had entered it on the shipping book of the company, and made out a way-bill of it in the name of the plaintiff as consignor, and B. L. Chamberlain of Chicago, as consignee, and that on the 10th of September, 1862, the defendant levied on these thirty bales in the car, and on nine bales in the warehouse, and ordered the agent to unload the car and return the brush to the warehouse. A demand was proved to have been made before suit brought.

On the part of the defendant the judgment in favor of Johnson was produced, and the execution and fee bill paid thereon. The judgment was rendered, March 5, 1862, and the execution was dated September 10, 1862, and returned levied on the property described in the declaration. The first judgment on the award of the arbitrators in October, 1860, was also produced in evidence, and the proceedings of this court thereon, whereby it appeared that the judgment of 1860 was reversed, and a judgment for a less sum entered up by this court.

F. C. Wells, who was then called by the defendant, stated, he resided in Chicago, and was in the employment of Wadsworth

and Wells as a collecting agent, that he was wholly ignorant of " the broom corn business," and was induced by Farr's representations to take the assignment of the lease, supposing there might be money in it; he paid no consideration for it; thinks he was informed by Farr, there was a matter in litigation between Johnson and Farr; may have informed him of Johnson's judgment; he did not say he intended not to pay the judgment, but considered it unjust; Farr had a contract with a Mr. Butler of Northampton, to buy brush on joint account, to be shipped to Butler, and to be sold by him, and the profits to be equally divided; this contract was also assigned; had previously bought some notes of Farr; there were no arrangements about the assignment of the lease and the contract until after the notes were assigned to him; advanced the money on the lease and paid Farr for his services in baling the brush; had previously arranged to pay him twenty-five dollars a week for his services; he knew nothing about the business and Farr did; made this arrangement with Farr after the lease was assigned; when he delivered the notes Farr had assigned to him to Bennet and Boies, he had no thought of taking the lease. In 1861, Boies was a partner of Bennet, in Galva; he assigned the lease to Boies in his office, on the 2d day of June, 1862; don't know whether Farr was present or not, but he was around; did not assign to Boies on the first interview, and did not go there for the purpose of selling; he owed Peterson, Lind and Gibson, and Boies went out and brought in receipts for it; he should have paid them the first of May; he wanted to dispose of the Butler contract, and also of the lease, because he wanted to get out of them; had the Butler agreement with him, and agreed to sell it to Boies for a sum of money he agreed to pay; he paid him $259, mostly in gold, for the Butler contract, and he assumed to pay a debt of $307 witness owed Peterson, Lind and Gibson for the assignment of the lease; Farr was present most of the time; is under the impression that Boies went and got the receipts of Peterson, Lind and Gibson. There was a trust deed on the premises described in the lease, and there was a payment due on it, and

the owner of it threatened to sell the premises, and he took the $259 received of Boies for the Butler contract, and loaned it to Farr to pay the interest on the trust deed, and took Farr's note and paid the incumbrance by draft on Boston; delivered the draft to Boies; Farr stays in Chicago now, and is in the employ of B. L. Chamberlain; supposes Chamberlain is the same man to whom the broom corn in suit was shipped.

This witness further stated on his cross-examination, that all the consideration he gave for the lease was assuming its liabilities; sold fifteen tons of the broom corn raised 1861, for $1,500; sold some in Chicago for thirty-five dollars a ton; shipped some to Boston and realized thirty or thirty-five dollars a ton; during the time he held the lease, had advanced to Peterson, Lind and Gibson some $1,200; wanted to get out of it, as he thought there was no money in it; Farr wanted to sell it before he sold to witness, to get something to pay his creditors, but they would not take it; he sold the Butler contract first before he sold the lease, and at the time he sold it he did not know that he should sell the lease to Boies; $259 was all the Butler contract was worth; the assumption of the liabilities of the lease was all that was worth; had no intention of cheating Farr's creditors; loaned Farr the $259 received for the Butler contract before he sold the lease, as the life of the lease depended upon the payment of the interest due on the trust deed; Boies had the $259 in gold in his pocket when they made the trade, and paid it to him, and he was allowed a commission on the gold; the notes and property assigned to witness by Farr were honestly assigned to pay debts; knew Farr six or eight years ago at Lafayette; Bennet paid out of the collection of notes, money to Peterson, Lind and Gibson on the lease, as he said, but the amounts were small; paid Farr for his services baling the broom corn and shipping it, $125, which was cheap enough, as he understood the business, and did not know where he could get a hand so competent as Farr; Boies agreed to pay Peterson, Lind and Gibson $307, and brought their receipts; none of the money paid by him to Boies came from Farr that he knew of; nothing was said by Boies about Farr's business; no

18

conversation was had about protecting Farr against his credi-
tors; don't think it was thought of.

On being re-examined he said some of the broom corn sold
for $100 a ton in Chicago; Farr sold it; witness telegraphed
him to come up to Chicago and sell it; the most of it was sold
on an average of sixty dollars a ton; paid Farr for coming up
and selling it; the money received for it was paid to witness;
got one-third of the broom corn on the lease, and the balance,
according to the terms of the lease, at seventy-five dollars a ton;
did not make the interest on his money and his expenses out of
the one-third; was raised in 1861, about sixty tons of brush
on the premises.

Peterson, being recalled by plaintiff, stated that after the 2d
day of June last, and after the lease was assigned to Boies by
Wells, he (Boies) advanced $1,200 to Peterson, Lind and Gibson
on the lease, and paid the three persons named each twenty-nine
dollars.

The plaintiff then called A. J. Rockafellow, and proposed to
ask him this question: State, if you know, where or of whom
the plaintiff got the money, or any part of it, advanced by him
to Peterson, Lind and Gibson on the lease? To which the
defendant objected, as not rebutting, and the court sustained
the objection; to which the plaintiff excepted.

On this evidence the court gave to the jury all the instruc-
tions the plaintiff asked, placing the good faith of all these
transactions fairly to the jury on the evidence, and as favorable
to the plaintiff as, in our judgment, the evidence warranted.
The record recites: "To each of which several modifications
and modified instructions and giving thereof, the plaintiff then
and there excepted." Now, the record fails to show what por-
tion of the plaintiff's instructions was modified by the court,
or that any of them were modified or changed from the ori-
ginal form, or their substance or point altered in any respect;
so we cannot say what the modifications were, or whether pro-
per or the contrary. To enable this court to pass upon the
propriety of modified instructions, the instructions as asked

should be before us, and also the modifications as made by the court.

The instructions given on behalf of the defendant, and excepted to, were as follows:

1. Every sale, assignment or conveyance of property, made by the parties to it, with intent to hinder, defraud or delay creditors existing at the time, as to the collection of their debt, is void as to such creditors, whether such sale, assignment or conveyance was made with or without a valuable consideration therefor.

2. If the jury believe, from the evidence, that Johnson was a creditor of Farr at the time of the assignment by Farr to Wells, and further believe that such assignment was made by them to hinder, delay or defraud Johnson, in respect of his debt, then they may and ought to regard said assignment as void; and notice by Farr to Wells at or before the time the assignment was made, that Johnson was a creditor whom he wished and intended to postpone, delay or hinder; the assignment without any actual consideration by Wells; the employment by Wells of Farr, in connection with the property assigned, if proved to the satisfaction of the jury, are circumstances to be considered by them as tending to show such intent to hinder, delay or defraud said Johnson.

3. If the jury believe, from the evidence, that Wells afterwards assigned to Boies, the plaintiff, with intent or purpose by them to hinder, delay or defraud said Johnson in respect of said debt against Farr, then they should find said last mentioned assignment void as to Johnson, and the property covered by such assignment as still liable to execution in favor of Johnson; the assignment without a consideration or for a consideration furnished by Farr; the application of the proceeds to the payment of other debts of Farr; acts of Farr showing a personal interest in the property covered by such assignment, at and after the time when it was made, and the like; with notice to Boies of the existence of the debt in favor of Johnson, and of Farr's and Wells' interest, thereby to hinder, delay or defraud said creditor, are circumstances which, if

proved, the jury may consider as tending to show such intent by Wells and Boies in making said last assignment.

4. If, at the time of the transfer of the lease from Farr to Wells (May 1, 1861), Johnson had recovered a judgment against Farr, which was then or afterwards appealed to the Supreme Court, and judgment afterwards again rendered in the Circuit Court on the proceedings had in the Supreme Court, this would constitute Johnson such a creditor of Farr as to entitle him to take advantage of any sale, transfer or assignment by Farr, which the law would hold void as to his creditors.

5. If Johnson is a judgment creditor of Farr, and the assignment to Wells was made or intended by Farr, in whole or in part, to defraud, hinder, delay or postpone the collection by Johnson of his judgment, and Wells knew of such intent, or had knowledge of facts and circumstances from which such intent was reasonably and necessarily inferable, then such assignment is in law fraudulent and void as against the rights of Johnson, and if Wells, with like intent and purpose, assigned to Boies, with like knowledge of such an intent, or if the facts and circumstances from which it was to be reasonably and necessarily inferred, then the assignment to Boies is in like manner fraudulent and void as to the rights of Johnson as a creditor of Farr.

No person reading the testimony in this case can reasonably doubt that Peterson, Lind and Gibson, Wells and Boies, were the willing instruments by which Farr was to work out his escape from the effects of Johnson's judgment, and that the lease was a mere cover to the design, and made on purpose to be assigned, he (Farr) exercising control and receiving its benefits, no matter who might be the assignee. Else, why so frequent allusion to a probable assignee? why the ready assent of the lessees to an assignment by Farr, with or without notice to them? why the readiness to accept any unknown assignee, who might or might not be able to perform the engagements of the lease, if there was not a secret understanding and agreement all the while that Farr was to have the control, and his responsibility, the guarantee to the lessees? It was a new device, this lease, with three new and most unusual stipulations

in it, to cover property from the claims of creditors. It was cunningly devised, but so cunningly as to betray its character by its excess of that quality. Is it possible that persons capable of contracting would, if they had no sinister designs, solemnly agree to take any man, no matter how irresponsible he might be, as a purchaser on time for such a large quantity of valuable property, two-thirds of a crop of broom corn, weighing forty tons, and of the average value of sixty dollars a ton? The stipulations in the lease show most clearly that these lessees were the mere tools of Farr, with which he was to work out his design to baffle, delay, hinder and defraud Johnson out of the proceeds of his judgment. This property and the crop of broom corn was all he had unincumbered and liable to execution, a deed of trust existing on the land, and it was a matter of great moment with him how he should save it, and this cunning device of a lease was the fruit of his labor and intention to effect his dishonest purpose.

But it is said, admitting such was the design, how are Wells and Boies implicated in it? where is the evidence to connect them with the intent to hinder, delay or defraud Johnson?

The facts show that while the suit was pending against Farr and in favor of Johnson, and but a few days only before it was finally decided, Farr proceeded to Chicago, a distance of more than one hundred miles from Galva, the town of his residence, and there had an interview with his old and valued friend F. C. Wells, whom he had known six or eight years before in Lafayette. Wells was a keen speculator and eager to embark in anything that had, or appeared to have, money in it. To this valued friend, then engaged in a collection agency for the house of Wadsworth and Wells, Farr opened his bosom, giving F. C. Wells a history more or less minute of his financial embarrassments, and tells him of the judgment Johnson has against him, and that it was unjust, but he never said he did not intend to pay it, but it was unjust. An unjust judgment is not a very comfortable affair, nor is a just one, if the party against whom it is rendered is not quite ready to satisfy it. But this judgment of Johnson is unjust, and how, say these schemers in consulta-

tion, how can it be avoided, how can we defeat Johnson on the execution? Wells shall become the ostensible owner of this lease, and shall be the recipient of its benefits. It is a valuable contract, and he is entreated to accept it, for no other consideration than the assumption of the responsibilities created by it, and also there is generously assigned to him the contract with Butler for the purchase of broom corn, with money supplied by Butler, and about which Wells had nothing to do, but to sit still and receive an equal share of the profits. All these were generously given by Farr to Wells without any valuable consideration, who accepted them with a full knowledge of the judgment in favor of Johnson, against Farr. No reason is given by Wells why Farr offered these things to him, and none can be divined except as they may be gathered from Wells himself, who was ready to undertake any little speculation in which there might be money, and being keen and smart withal, he could so manage the business under the lease, though wholly unacquainted with the broom corn business, as to carry out the design of Farr and his accommodating tools, the lessees, and at the same time put some money in his own pocket. Being disappointed in this, his sales of brush bringing him a few dollars in debt, he casts around for a purchaser of the lease, and Farr is ready to find him one in the plaintiff, his lawyer, through whose ingenuity he still hopes for success in his scheme. Whilst Wells was the owner of this lease Farr managed the whole concern, sold the brush, received the money for it, and paid it over, as Wells says to him, but whether or not he paid it back again to Farr he did not state, and for Farr's valuable services in baling the brush and preparing it for market, he paid Farr the sum of twenty-five dollars per week, when, by the express terms of the lease, the lessees were to do all this, at their own cost. This pretended employment of Farr, at high wages, to do the very things the lessees were bound to do, was a mere contrivance by which Farr should keep in the management of a business which was evidently carried on for his own exclusive use, benefit and advantage. So far as Wells is concerned, the jury were satisfied in finding that he was confederated with

Farr to delay Johnson in the collection of his judgment by execution.

Now, as to the complicity of the plaintiff Boies, in the transaction. The evidence against him is of a character somewhat circumstantial, but clearly establishing, as against him, a knowledge of, and as participating in, the attempt to delay Johnson.

Wells states that the money he advanced under his stipulations in the lease, was sent from Chicago to Bennet, who was the law partner of Boies, and paid over to the lessees, in the office of Bennet & Boies. Where Wells obtained this money is not shown, though it is strongly to be inferred it was avails of brush he had sold, and of the notes Farr had assigned to him before he would take an assignment of the lease. Wells, disappointed in his hopes of making great gains for himself out of this lease, visits Galva, the residence of Farr and Boies, and has an interview with Boies at his office. Farr, if not actually present, was "around," was there and thereabouts, and had provided Boies for Wells as a proper assignee under whose protection he could enjoy the harvest of broom corn, and laugh at Johnson and his execution. The affair seems to have been cleverly managed; Boies has $259 in gold, in his pocket, not a cent more or less, a sum just sufficient to pay the interest due on the deed of trust, and which, if not paid, the premises yielding the broom corn would pass out of their possession. Boies has on hand the exact sum in gold, which he pays over to Wells for the Butler contract, before he had purchased the assignment of the lease. For this gold, besides the Butler contract, Wells gave to Boies a draft on Boston for the amount, which Boies remitted east, to pay this interest due by Farr on the deed of trust, and Farr gave his note to Wells for the amount. At this time Boies was quite busy in going out, and getting receipts of the lessees for demands Wells says they had on him, during which time Farr was not only "around," but generally present, leaving the inference irresistible that he was doing all these things under the promptings and by direction of Farr. The assignment had not yet been perfected by Wells, and Farr takes Boies to Peterson, one of the lessees, and, it

seems, the managing one, and induced him to accept Boies in place of Wells, as a fit person to assume the responsibilities under the lease, and Peterson, in ready obedience to the demands of Farr, consents to accept Boies, whom he did not know, on the faith of Farr's representations. Wells then assigned to Boies the lease, receiving what was due from him to the lessees on the sale of their broom corn in 1861, and which, by the lease, was due them in May, 1862.

. The assignment by Wells was made June 2, 1862, at which time Farr's case had been decided by this court, and judgment was finally entered up in the Circuit Court, of all which these parties were well advised, and Wells wanted to be out of the concern; he did not wish to be involved in litigation about this property which might follow upon Johnson's judgment, and with the receipts of the lessees which Boies had promised for him, by which he was discharged from their claim, amounting to three hundred and seven dollars, and the profits on the sale of broom corn made in 1861, fifteen tons of which he sold for fifteen hundred dollars. Wells gets out of it, and Boies, living in Galva, takes his place, much to the satisfaction of Farr, who could more readily avail himself of legal advice, and keep an eye upon his assignee. But not to go over all the facts conducing to show Boies' complicity in these transactions, it is sufficient to state the crowning facts, that in September or the first of October, 1862, about the time the brush was ready for market, Farr changed his residence to Chicago, and entered into the employment of B. L. Chamberlain, the very person to whom Boies consigned the brush levied on by the sheriff. What was this but a mode of getting the brush into the possession of the real owner? For so Farr must be considered, in the light of all the facts proved. Boies' advances, about which Peterson testified, were amply reimbursed by the third of the crop, which, if as large as the crop of 1861, would amount to twenty tons, and worth from sixty to one hundred dollars a ton.

To show Boies' probable knowledge of Farr's condition, it is only necessary to advert to the fact that he was, with Farr, a

resident of Galva when the arbitration between Farr and Johnson, and all their litigation was had; he was a practicing lawyer of the court when the judgment was entered against Farr, and it is next to impossible that he should not have been cognizant of it, and of the relations subsisting between Johnson and Farr. Such things are widely and generally known in small villages, and most especially by practicing lawyers. The business of dealing in broom corn is so foreign to the business of a lawyer, that strong suspicions are naturally excited, if one does engage in it, that it is for a sinister purpose. The conviction is brought home to the mind, by all the facts, that Boies was a party to this design of Farr so to dispose of his property, that he could enjoy the rents from it, and at the same time keep it from the claims of creditors.

The principal witness to prove most of the facts showing this intent was one of the parties to the transaction, and stands in the position of a reluctant witness, but enough evidence was obtained from him to justify the jury in finding the fraudulent intent charged.

It is always a matter of great difficulty to make out a case of fraud to the satisfaction of a jury, depending, as it usually does, on a multitude of circumstances. To find the thread connecting them, and to pursue it to the end, is no small labor. Plans to defraud are concocted in secret, no one concerned will proclaim them from the house-top, and great industry and sagacity is required to expose them. Fraud is not to be presumed, it is said, on the principle that no person is presumed guilty of an offense with which he is charged, yet his guilt may be inferred from circumstances proved. So with fraud, circumstances will establish it, and we think they abound so greatly in this case, and are of a nature so convincing, that the jury could not hesitate about their verdict. Farr's control is observable in all the transactions, from the day of the execution of the cunningly devised lease to the moment of the shipment and consignment of the brush in controversy to himself at Chicago, under the name of B. L. Chamberlain, with whom he was "staying." Under the circumstances proved we could not set aside the ver-

dict, and we would not because we believe substantial justice has been done. The instructions given for the defendant are the law on the facts proved, save that in our statute of frauds the word "postpone" is not used. But holding it to be synonymous with delay, we think no exception should be allowed on that account.

As to the offer to prove by Rockafellow, where Boies got the money to make his advances, it was in no sense rebutting testimony, and was properly refused by the court. That had not been made a question by the defendant at any point of the investigation, and therefore could not properly come in as rebutting testimony.

Perceiving no error in the record, we affirm the judgment.

*Judgment affirmed.*