## Seth F. Hanchett

### v.

## John W. Goetz et al.

*Sales—Fraud as to Creditors—Notice to Purchaser—Antecedent Debt —Notice—Defective Instruction.*

1. It seems that a creditor of a failing debtor may accept a stock of goods for his debt without reference to the motives by which his debtor may be actuated, provided he himself acts in good faith.

2. Where an antecedent creditor of a failing debtor purchases a stock of goods at a price largely in excess of the debt, the goods so purchased being divisible, he must be treated as a mere purchaser, at least as to such excess, and subject to the rules of law governing that relation.

3. Where a debtor sells property with intent to hinder, delay or defraud his creditors, notice to the purchaser of the debtor's fraudulent intent is *per se* evidence of *mala fides*, and renders the sale void without reference to the purchaser's actual intent, the fraudulent motive of the debtor being imputed to the purchaser.

4. In the case presented it is *held:* That an instruction was erroneous in stating, under the facts supposed, that it was immaterial whether the purchaser had any reason to suspect the motive or intent of the debtor.

[Opinion filed March 28, 1888.]

Appeal from the Circuit Court of Cook County; the Hon. Lorin C. Collins, Judge, presiding.

Messrs. Flower, Remy & Holstein and S. S. Gregory, for appellant.

The evidence is conclusive that Strouse & Meyer disposed of their property hurriedly and at a grossly inadequate price to prevent its seizure by their creditors, to enable them to divert its proceeds to the payment of alleged indebtedness existing against each individually.

The mere fact that the notes given in payment for this property ran from four months to a year, in connection with the insolvency of Strouse & Meyer, and the fact they never did pay their partnership creditors, was enough to entitle ap-

pellant to go to the jury on the question of the fraudulent intent of Strouse & Meyer. Roberts v. Radcliff, 11 Pac. R. 406; Spaulding v. Adams, 63 Ia. 437.

A sale by insolvents on such long credit may, perhaps, not be necessarily fraudulent. But it is of such a character that, unless satisfactorily explained, the presumption of fraud becomes irresistible. Here every attendant circumstance tends to verify and confirm the natural presumption. Strouse & Meyer never have paid their creditors. By this sale and the distribution of its proceeds they deprived themselves of all power to do so; and there is nothing to indicate that when they made it they had any idea of turning out its proceeds to their creditors.

It also is clear that there was evidence ample to warrant a jury in finding that appellees knew or ought to have known that Strouse & Meyer contemplated a fraud. The making of the notes on long time, dividing them up, two maturing the same day, each for the same amount, the haste attending the sale, the gross inadequacy of the price, the fact that after the price was agreed on Strouse & Meyer so readily assented to reducing it from $47,500 to $31,500 on the frivolous pretext that their liability on the lease would continue after they surrendered possession of the demised premises to appellees, their lessors and the purchasers of their stock, all these things taken in connection with the letter of attorney from Strouse & Thanhauser, which was submitted to appellees and their counsel, were unerring indications of a dishonest purpose—sure and usual badges of a fraudulent intent.

Under such circumstances, knowing their embarrassed condition, and acquainted with all these facts, appellees can not be permitted to claim immunity as *bona fide* purchasers.

The law will not allow them to shut their eyes when their ignorance is to benefit themselves at the expense of another, when they would have them open and inquiring had the consequences of their ignorance been detrimental to them and advantageous to others. Doyle v. Teas, 4 Scam. 202.

They made no inquiry; did not seek to know what arrangements Strouse & Meyer contemplated for the future, nor how,

after having closed their store and sold their stock at about forty cents on the dollar, on long time, they could pay their creditors. Nor did they inquire why this mysterious division of notes was required. This is almost a case where the court below should have directed a verdict finding the fraudulent purpose and knowledge, or notice of it, in the minds of appellee. Much more is it a case where appellants are entitled to accurate instructions to the jury.

The eighth instruction given for appellee, when fairly construed, simply comes to this: that if Goetz & Co. purchased the stock of Strouse & Meyer solely for the purpose of protecting themselves against loss, then they are to be justified, no matter what may have been the intent of Strouse & Meyer, nor what notice they may have had of such intent.

The concluding portion of the instruction would not be bad law alone as applied to a proper case, but taken in connection with what goes before it, clearly imports that a purchaser may in good faith buy of an insolvent vendee, even when the latter intends a fraudulent disposition of the proceeds of the sale, and the purchaser is chargeable with notice of such intent. The substance of the instruction is, that even if Strouse & Meyer had told Goetz & Co. that they were intending to take the money and notes received in part payment for their stock and run away to Canada with them, and that their object was to cheat and defraud their creditors, still Goetz & Co. could hold the goods, provided their motives were simply to further their own interests, and not to aid the fraudulent design entertained by their vendors.

Such a proposition certainly ought to be fortified by authority in order to command serious consideration. It is essential to plaintiff's case.

If a debtor part with his property for the purpose of placing any part of it, or the proceeds thereof, beyond the reach of all creditors, this is a fraud; and knowledge or notice of that purpose will affect title to the property so conveyed in the hands of the vendee. Crawford v. Kirksey, 55 Ala. 282; S. C., 28 Am. R. 704.

A creditor may lawfully take from his debtor a conveyance,

with the honest purpose of securing his own debt, although he knows that it is intended to hinder and delay other creditors. Shelly v. Booth, 73 Mo. 74; S. C., 39 Am. R. 481.

In McVeagh v. Baxter, 82 Mo. 518, the court supplemented this decision and laid down the law exactly as here contended for. That was a case where the creditor purchased goods of his debtor at a price in excess of his debt, and claimed to be entitled to hold them, even though he knew that the excess so paid to the debtor was intended by the latter to be placed beyond the reach of his other creditors. If it is conceded that the plaintiffs are to be treated as creditors of Strouse & Meyer, by virtue of the lease, then this case is a complete authority against the validity of this instruction. See also, McDonald v. Gaunt, 30 Kas. 693; Openheimer v. Halff, 4 S. W. Rep. (Tex.) 562.

The principle as to notice, decided in the Kansas cases, is enunciated in the leading case of Doyle v. Teas, 4 Scam. 202. The principles there announced have been repeatedly acted upon in subsequent cases, and particularly in the case of Hanchett v. Kimbark, 118 Ill. 121–131.

Mr. John N. Jewett, for appellees.

"The fact that a firm was in debt when the partners made a conveyance of their property is not sufficient to raise a presumption that the conveyance was fraudulent. In order to avoid such conveyance proof must be given that it was with the intention to defraud the creditors of the firm or subsequent purchasers, and that the grantee had knowledge of such intention." Green v. Tanner et al., 8 Met. 411.

"To render a conveyance void as to creditors, on the ground that it was made with intent to defraud them, the grantee must have knowledge of and participate in the fraud of the grantor." Partelo v. Harris, 26 Conn. 480.

"The sale of the entire effects of an insolvent copartnership upon credit, at a fair valuation, to a responsible vendee having knowledge of the insolvency, is not *per se* fraudulent. Although made by the vendor with intent to hinder, delay and defraud creditors, that does not affect the title of the purchaser unless he had previous notice of the fraudulent intent."

Hanchett v. Goetz.

Ruhl v. Phillips et al., 48 N. Y. 125. See, also, Bancroft v. Blizzard, 13 Ohio, 30; Chouteau v. Sherman, 11 Mo. 385; Magniac v. Thompson, 7 Pet. 348; Splaure v. Martin, 17 Ark. 146; Pope v. Wilson, 7 Ala. 690.

The fact that a man, in making a purchase of property, is acting for his own interest or to save himself from pecuniary loss, can not be considered a factor in the transaction detrimental to its honesty or good faith. In all such cases self-interest may be assumed to be the impelling force. It is for profit to himself that the merchant buys and sells. Self-interest is the prompter to all the industries of life. It oftentimes mingles with its charities and sociabilities. It may be counted upon as *always* present as an inducement to all business activities.

The eighth instruction, in its relations to the case at bar, is fully sustained by the decisions of our Supreme Court in analogous cases. Ewing v. Runkle, 20 Ill. 448.

"The law is that both parties must contrive the conveyance with malice, fraud, covin, collusion or guile. They must both be guilty of the contrivance and intent." See, also, Waterman v. Donaldson, 43 Ill. 29.

Properly read and construed in the light of the facts of the case, it seems to me to be demonstrated that the eighth instruction is fairly within the limits of the law as laid down by our Supreme Court, and also in the cases cited against it by counsel on the other side, and that no injustice has been done to the appellant by the judgment of the court below, from which the pending appeal has been presented.

Bailey, J. This was an action of replevin, brought by John W. Goetz and Louis W. Reiss, copartners under the name of Goetz & Company, against Seth F. Hanchett, Sheriff of Cook County, to recover possession of certain goods levied upon by said Sheriff, by virtue of sundry attachment writs against the firm of Strouse & Meyer, composed of Henry L. Strouse and Samuel Meyer. The Sheriff appeared and pleaded *non cepit, non detinet*, property in Strouse & Meyer, and justification under said writs of attachment, and, on trial before the court and a jury, the verdict and judgment were in favor of the plaintiffs.

For several years prior to 1883, Goetz & Company had been whosesale and retail dealers in gloves in the City of Chicago. Early in 1883, with the view of obtaining a better location for their retail business, they entered into a negotiation with one Hale for the lease of certain premises on the corner of State and Washington Streets, but said premises being larger and the rent, $18,600 per year, being higher than their business required or warranted, they arranged to let the larger portion of the premises to the firm of Philip Schulof & Company, composed of Philip Schulof and Samuel Meyer of New York, and Henry L. Strouse, of Philadelphia, at an annual rental of $12,000, payable monthly, and a commission of two and one half per cent. of the gross sales made by that firm. Goetz & Company thereupon took a lease from Hale of the entire premises for a term of five years from May 1, 1883, and underlet the larger portion of the premises to Philip Schulof & Company, for.the same period and upon the terms above stated. After the execution of the lease but before the 1st day of May, 1883, Philip Schulof died, and Strouse & Meyer, composed of the surviving members of said firm, took possession of the portion of the premises so leased to them, and commenced business with a stock of silks and fancy goods, Meyer coming to Chicago and becoming the resident partner and Strouse remaining in Philadelphia and being engaged in business there as a member of the firm of Freidburger & Strouse. Strouse & Meyer continued to carry on an apparently prosperous business down to December 31, 1883, at which time, as subsequent events showed, they became embarrassed for want of sufficient capital.

At about the date last mentioned, Meyer was anticipating a visit from Strouse, and expecting to obtain from him money to relieve the embarrassments of the firm ; but, instead of coming himself, Strouse sent one Thanhauser, his brother-in-law, and an employe of the firm of Freidburger & Strouse, with instructions to close up the business of Strouse & Meyer. Thanhauser arrived in Chicago December 31, 1883, bringing with him a power of attorney from Strouse, authorizing him to make or join in a general or partial assignment of the

property of Strouse & Meyer for the benefit of its creditors, or to confess judgments to such persons and for such amounts, or to deliver a bill or bills of sale in the name of said firm for such property and to such persons and upon such considera- tion, as to him might seem just and proper, and, generally, to take all steps and do all acts which he might deem proper or necessary to settle up the business and affairs of said firm.

On reaching Chicago, Thanhauser showed his power of attor- ney to Goetz & Company, and had various negotiations with them in relation to closing out the business of Strouse & Meyer, and said negotiations finally resulted in a sale to Goetz & Company of the entire stock of goods of Strouse & Meyer for the sum of $47,500. As a part of said negotiations, Goetz & Company and Strouse & Meyer compromised the liability of the latter firm upon its lease, which then had four years and four months to run, at $16,000, which sum, taken from the purchase price of the stock of goods, left $31,500. This sum was paid by Goetz & Company by a credit of $1,000 for a month's rent then due, by the payment of $5,500 in cash, and by executing to Strouse & Meyer their promissory notes for $25,000, said notes being in various sums and payable in four, eight, ten and twelve months after date. After the execution of these papers, the parties went to the store to consummate the sale by the delivery of the goods, and found the Sheriff in possession under an attachment for a small amount, which attachment was immediately discharged by the payment of the indebtedness for which it was issued, and the stock of goods was then delivered to Goetz & Company. After such delivery, and while said goods were in Goetz & Company's possession, the attachments against Strouse & Meyer, set up by the Sheriff in his plea of justification, were levied thereon, and the present writ of replevin was thereupon issued at the suit of Goetz & Company.

The evidence shows, beyond controversy, that at the date of said sale to Goetz & Company, the firm of Strouse & Meyer was actually insolvent, and also that a day or two afterward Strouse's firm in Philadelphia failed in business. The theory upon which said attachments are sought to be sustained is, that

said sale was made with the intent on the part of Strouse & Meyer to hinder, delay and defraud their creditors, and that Goetz & Company either had knowledge of such intent, or that the circumstances within their knowledge were such as were naturally calculated to excite their suspicion and put them on inquiry as to such intent.

The evidence tends to show that Goetz & Company, before underletting a portion of said premises to Philip Schulof & Company, made inquiries through the commercial agency of R. G. Dun & Company, and also of various parties in New York, as to the financial standing and responsibility of said firm, and received favorable reports from all sources. It also appears that Goetz & Company inquired of Thanhauser, on his arrival from Philadelphia, as to the pecuniary circumstances of Strouse, and were assured that he was perfectly solvent; and we fail to find in the record any direct evidence that, at the time of the purchase of said goods, Goetz & Company had any knowledge of the actual insolvency or pecuniary embarrassment of Strouse & Meyer, or of Strouse's Philadelphia firm, or any actual knowledge of any intent on the part of Strouse & Meyer to defraud their creditors. It is claimed, however, that the circumstances of the sale were sufficient to arouse their suspicions and to put them on inquiry, and that they must, therefore, be charged with notice of the fraudulent intent of Strouse & Meyer.

The evidence of a fraudulent intent on the part of Strouse & Meyer was sufficient, we think, to have warranted the jury in finding in favor of the attaching creditors on that issue. But that fact alone was clearly insufficient to entitle said creditors to a verdict. It was necessary that they should also succeed upon the issue of notice of such intent to Goetz & Company. We can not doubt that the circumstances disclosed by the evidence tending to charge Goetz & Company with such notice were sufficient to fairly present a question for the consideration of the jury, but as the verdict is against the creditors, such finding would be conclusive that no notice was proved, if the rules of the law laid down in the instructions to the jury in regard to notice had been subject to no legal

exception. We therefore dismiss the question as to the evi-·
dence of notice by merely saying that, if no error of law had
intervened, we should see no ground for disturbing the verdict,
or for dissenting from the conclusion to which the jury have
arrived.

Complaint is made of two instructions, the fourth and
eighth, given at the instance of the defendant. We are of the
opinion that the fourth instruction is obnoxious to no material
criticism, but that the eighth instruction is substantially erro-
neous.

The fourth instruction holds, in substance, that if Goetz &
Company purchased and received possession of the goods in
question from Strouse & Meyer, the burden of proving that
such sale was fraudulent was upon the creditors attacking it,
and that if said sale was made and consummated in good faith
and for a valuable consideration and without any fraudulent
purpose or intent, Goetz & Company acquired a good title
thereto as against said creditors. Said instruction is prefaced
by the following statement as to what constitutes legal proof
of fraud: "Fraud in a business transaction of purchase and
sale must be proved, either directly and affirmatively by the
party alleging it, or by such facts and circumstances as are suffi-
cient to establish it to the satisfaction of the jury. It is never
to be presumed." The criticism upon this instruction is, that
it requires proof of fraud to be made to the "satisfaction" of
the jury, and that this word imports a higher degree of con-
viction on their part than is required by law in civil cases.
We are aware that the Supreme Court has on one or two oc-
casions condemned the use of this word in this connection for
the reason here stated, and we recognize the authority of
those decisions so far as they apply to this case. It can not
be said, however, that because a particular word is objection-
able when used on one occasion, and in reference to a partic-
ular set of circumstances, it is liable to the same criticism
always and on every occasion. The words belief, conviction
and satisfaction, are used in ordinary legal language as sub-
stantially synonymous, and all are words which admit of appli-
cation to various degrees of conviction or certainty of belief.

It would be palpably absurd for a jury to say by their verdict that certain facts existed, so long as they do not believe or are not convinced by the evidence of their existence. It would seem to be equally absurd for them to report as their finding that, as to the truth of which they are dissatisfied. How can there be belief without some degree of conviction or satisfaction as to the existence of the fact believed?

In Carter v. Gunnels, 67 Ill. 270, an issue of fraud was presented to be tried by a jury, and the court, in condemning an instruction which required the fraud alleged to be proved, directly, or "by such facts and circumstances as would make the conclusion reasonable and irresistible," lays down the doctrine as to proof in such cases as follows: "What circumstances will amount to proof can never be matter of general definition; the legal test is the sufficiency of the evidence to satisfy the understanding and conscience of the jury." The foregoing language is quoted *verbatim* from 1 Starkie on Evidence, 514, and the same learned author defines circumstantial or presumptive proof to be, "that measure and degree of circumstantial evidence which is sufficient to produce conviction in the minds of the jury of the truth of the fact in question." 1 Starkie on Ev., 495.

In Hough v. Dickinson, 58 Mich. 89, it is said: "Fraud, like any other fact, may be proved by facts or circumstances which satisfy the mind by a preponderance of the evidence in any given case of its existence." The same language is also used in O'Donnell v. Segar, 25 Mich. 367. In Coit v. Churchill, 61 Iowa, 296, it is held that a rule in a civil case requiring the evidence to be clear and satisfactory, is only equivalent to the rule requiring proof by a preponderance of the evidence. "As the law requires no great quantity, when that measure is reached, it must be regarded by the jury as clear and satisfactory, for it is the precise quantity prescribed by the law."

But even if we are constrained to hold that said instruction was technically erroneous, it would be difficult to see how such error could have materially injured the defendant. In the instructions given at the instance of the defendant, the

rule as to the measure of proof necessary to establish fraud was clearly and correctly laid down, and, taking all the instructions together, it seems very clear that the jury could not have been misled into supposing that anything beyond a mere preponderance of the evidence was necessary to establish the fraud alleged.

In may furthermore be observed in this connection, that it is very apparent from all the evidence, that the issue upon which the defendant failed before the jury was not as to whether Strouse & Meyer were guilty of fraud, but as to whether Goetz & Company had notice of such fraud. The real controversy before the jury was upon that question, and the error in the instruction, if it was an error, had no influence in the determination of that issue.

In the plaintiffs' eighth instruction, however, there is an error which seems to us to be of a more serious character. In the instructions given for the defendant, the rules of law applicable to the case, viewing Goetz & Company as mere purchasers of the stock of goods in question, are very fully, clearly, and, as we think, correctly, laid down. Those instructions held, among other things, in substance, that if Strouse & Meyer, in making the sale of said goods, intended to hinder, delay or defraud their creditors, or to prevent them from collecting their debts in due course of law, and that Goetz & Company purchased said goods with knowledge of said fraudulent purpose, or with knowledge of circumstances of such character as to excite their suspicions, and which, if investigated and followed up by them, would have led to actual knowledge of said fraudulent purpose, the sale was void as to said attaching creditors, and the verdict should be for the defendant. The plaintiffs' eighth instruction was as follows:

"The jury are further instructed, that though they may believe, from the evidence, that Strouse & Meyer, at the time of the sale in question, intended to hinder and delay or defraud their creditors, yet by the terms of the lease in evidence between Samuel Meyer, Philip Schulof and H. L. Strouse, on the one part, and the plaintiffs on the other, the said Strouse & Meyer were obligated to pay the plaintiffs $1,000 per month up to

May 1, 1888, absolutely, besides two and one-half per centum of their sales in certain contingencies; and if the jury believe, from the evidence, that in making the purchase in question of said Strouse & Meyer, the plaintiffs acted in good faith, and solely with a view to the protection of their own interest under said lease; and if the jury further believe, from the evidence, that it was necessary for them to take action to protect themselves from financial loss, and purchased the goods in question for a fair consideration, without any fraudulent intent on their part, then the intent of Strouse & Meyer in the transaction is immaterial. And under such circumstances it is also immaterial whether or not the plaintiffs had any reason to suspect the motive or intent of said Strouse & Meyer, the law being, that parties acting in good faith and solely for the protection of their own interests, have a right to purchase property from persons under obligation or financial liability to them, even though the seller may be indebted to others who are unable to collect their debts, provided only that the transaction is a fair one and free from any actual fraud."

At the time of the purchase of the stock of goods by Goetz & Company, Strouse & Meyer were their lessees under a lease having fifty-two months to run at a rental of $1,000 per month. Strouse & Meyer's liability under this lease was liquidated and compromised at $16,000, Goetz & Company to accept in consideration of that sum a surrender of the lease; and in considering the foregoing instruction, this sum may be treated as a *bona fide* indebtedness from Strouse & Meyer to Goetz & Company, existing at the time the negotiations for the purchase and sale of said stock of goods were entered upon. It seems to be the rule that a creditor of a failing debtor has a right to collect or obtain security for his debt without reference to the motives by which his debtor may be actuated, providing he himself acts in good faith. Thus, in Marble v. Bonhotel, 35 Ill. 240, it was held that knowledge by the creditor of the fraudulent intention of his debtor did not prevent him from receiving payment of an honest debt, the court saying, "a creditor violates no rule of law when he takes payment of his demand, though other creditors be thereby deprived of all

means of obtaining satisfaction of their own equally meritorious claims."

The present case, however, involves elements which take it out of the rule here stated. Goetz & Company do not hold the position of mere creditors obtaining from their insolvent debtors payment of a *bona fide* antecedent debt. Their debt, including one month's rent then in arrears, amounted to only $17,000, but the purchase price of the stock of goods was $47,000, and after applying their debt, there remained $30,500 of the purchase money, which was paid by them to their creditors in cash and promissory notes. Indeed, it would seem from the account of the transaction given by the witnesses, that the purchase of the stock of goods was the first and principal thing, and the obtaining payment of said indebtedness, a subsequent and incidental matter. To say the least, Goetz & Company occupy the two-fold relation of creditors seeking satisfaction of an antecedent debt, and purchasers obtaining title to the goods by purchase and the payment of the consideration money at the time. As to much the larger part of the price paid, they must be treated, not as antecedent creditors, but as mere purchasers, and subject to the rules of law governing that relation. Especially is this so in the absence of any proof tending to show that the subject of the purchase was indivisible. There is no reason to suppose that the stock of goods might not have been divided so as to apportion to Goetz & Company a sufficient sum to pay them their claim and leave the residue within the reach of other creditors.

The case of McDonald v. Gaunt, 30 Kansas, 693, is here quite in point. There a creditor purchased his debtor's stock of goods and merchandise of different classes, and easily separable, of the value of $2,350, and paid $1,600 by the surrender of his debtor's note for that sum, and the residue in money, the transaction on the part of the debtor being with intent to hinder and delay his other creditors, and it was held that if the creditor had knowledge of such fraudulent intent, or if the circumstances surrounding the purchase were such as would put a prudent man upon inquiry, which, if prosecuted

diligently, would disclose the fraud, the purchase could not be upheld. The court say: "The creditor could not make the purchase of the stock of goods in controversy, even to secure himself, with the further object and effect of defrauding, hindering and delaying other creditors in respect to the excess of property over his debt. If, however, the purchase was ancillary to the main object of saving his own debt, and was not fraudulent in actual intent, and was made with caution and diligence which an honest man would ordinarily exercise, the purchase ought to be sustained."

Substantially the same distinction is taken in Crawford v. Kirksey, 55 Ala. 282, the court saying: "The creditor must not go beyond the permissible purpose of securing his demand. If he go beyond this and secure a benefit to his debtor, he will thereby violate both the letter and spirit of the statute, and the conveyance will be set aside for fraud." Mr. Bump, in his Treatise on Fraudulent Conveyances, 205, says: "Where the necessary effect of a transfer is to secure the application of the full value of the property to the discharge of certain debts of the grantor in a manner satisfactory to the holders of those debts, the case is not distinguishable from that of a conveyance to the creditors themselves in discharge of real debts at a fair price." When, however, the sale is made with the intent on the part of the debtor to defraud his other creditors, and the creditor purchasing has knowledge or notice of such intent, and the necessary effect of the transaction is to convert the larger part of the value of the property into money or securities, which the debtor may more easily place beyond the reach of his creditors, the case clearly falls within the rule ordinarily applicable to fraudulent sales and conveyances, and the sale must be held to be void as against the creditors thus sought to be defrauded.

The rule in relation to sales of property by a debtor, with intent to hinder, delay or defraud his creditors is, that notice to the purchaser of the debtor's fraudulent intent is *per se* evidence of *mala fides*, and renders the sale void, without reference to the purchaser's actual intent, for the motive of the fraudulent debtor is in that case imputed to the purchaser as

a fraud in law, and makes the purchase *mala fide.* It is not necessary that he should have actual knowledge of the debtor's fraudulent intent, but a knowledge of facts and circumstances sufficient to excite the suspicions of a prudent man and put him on inquiry, or lead a person of ordinary perception to infer fraud, amounts to notice, and is equivalent, in contemplation of law, to actual knowledge. See Bump on Fraudulent Conveyances, 200.

The rule laid down by the eighth instruction is, that if it was necessary for Goetz & Company to take action to protect themselves from financial loss in respect to their lease to Strouse & Meyer, and that in making the purchase in question they acted in good faith and solely with a view of protecting their interest under said lease, and without any fraudulent intent on their part, then the intent of Strouse & Meyer was immaterial, and it was also immaterial whether or not Goetz & Company had any reason to suspect the motive or intent of Strouse & Meyer.

In the light of what we have already said, the errors in this instruction are too apparent to need much further elucidation. If, under the facts supposed, the intent of Strouse & Meyer was immaterial, then it would be unimportant whether Goetz & Company had actual knowledge or notice of such intent or not. The instruction, therefore, may be regarded as holding that, upon the hypothesis laid down, the sale must be held to be valid, even though the jury should find that Strouse & Meyer, in making it, intended to defraud their other creditors, and that Goetz & Company knew or had notice of such intent. This is clearly wrong. The sale, as made, being only in part for the satisfaction of Goetz & Company's claim, must be held to be fraudulent, if made with intent on the part of the sellers to defraud their other creditors, provided the purchasers had knowledge or notice of such intent.

For substantially the same reason it is apparent that the instruction was erroneous in holding that, under the facts supposed, it was immaterial whether Goetz & Company had any reason to suspect the motive or intent of Strouse & Meyer. Holding that it was immaterial whether they had any reason

for suspicion, was equivalent to holding that no ground of suspicion, however strong or convincing, could have been material, which is only another form of saying that, upon the hypothesis assumed, notice or knowledge on the part of Goetz & Company of the fraudulent intent of Strouse & Meyer was immaterial.

Upon the facts in the case we should have been very well pleased to affirm the judgment, but the error in the foregoing instruction seems to us to be so apparent and material as to present an insuperable obstacle to our doing so. For that error the judgment must be reversed, and the cause will be remanded for a new trial.

*Judgment reversed.*