## Alexander Beaver v. Danville Shirt Company.

1. SALES—*Change of Possession.*—Change in possession should be indicated by such outward, open, actual and visible signs as could be seen and known to the public or persons dealing with the goods.

2. ESTOPPEL—*Duty of One Who Mixes His Goods with Another's.*—It is the duty of a party who mixes his own goods with others, which are subject to the levy of an execution, to point out to the officer the

goods owned by him, and if he fails to do so he is estopped from afterward claiming them.

3. FRAUDULENT SALES—*Knowledge of the Purchaser.*—A purchaser of goods from an insolvent, with knowledge that the effect of his purchase is to hinder and delay the creditors of the seller, and that such was the seller's intention in making the sale, can not hold the goods as against such creditors.

**Trial of the Rights of Property.**—Appeal from the Circuit Court of Vermilion County; the Hon. FERDINAND BOOKWALTER, Judge, presiding. Heard in this court at the May term, 1896. Affirmed. Opinion filed December 19, 1896.

C. M. BRIGGS, attorney for appellant.

DYER & WALLBRIDGE, attorneys for appellee.

MR. JUSTICE PLEASANTS DELIVERED THE OPINION OF THE COURT.

This was a trial of the right of property under the statute, commenced before a justice of the peace and taken by appeal to the Circuit Court, where the verdict and judgment were against the claimant, who prosecutes this further appeal.

For some four years next before and up to September 12, 1895, if not to a later date, Nathaniel and Chauncey Beaver, as partners under the firm name of Beaver Brothers, carried on a retail business in dry goods, carpets and gentlemen's furnishings at Hoopeston. On the 23d of November of that year appellee placed in the hands of a constable an execution duly issued upon a justice judgment it had recovered against them for $68.50, and caused it to be levied upon the goods in controversy, consisting of certain trunks, valises, rugs and parts of rolls of carpet then in the store as part of the stock. Appellant claims that on the day first above mentioned he purchased their entire stock, and at the time of said levy was the sole and absolute owner thereof; and the question in the case is whether the alleged purchase was valid as against the execution.

Appellee contests it on two independent grounds: First,

that no apparent change of possession accompanied the purchase or followed it before the levy. From the abstract of the testimony it does not appear that anything whatever was done that was calculated to notify the public or anybody not in the employ of the firm or of appellant of any such change. It does not show that he was a younger brother of these execution debtors, who, after some years residence in Spokane, Washington, in January, 1895, returned to Hoopeston and there remained until the last of February. During that time he was in his brother's store, assisting about the business. Among other things, with the help of Mr. Evans, the head clerk, he made an inventory of the stock, amounting to $15,500. He then went to Chicago, as he says, to "make experiments in cabinets or show cases," and was there off and on for about five months, repeatedly returning to Hoopeston, which he says he considered his home, and whenever there assisted in the business of the store. He was there about the first of September, went back to Chicago and returned about the tenth, two days before the alleged purchase. His going and returning continued after it, as before, so that, so far as appeared, his presence and conduct there after it, was no more an indication of possession or proprietorship than before, except, perhaps, to the employes. He says that whenever he went away after it, he left Mr. Evans in charge of the store and cash, but if anybody else knew it, the fact was not shown. His brothers also continued to be there daily, caring for the stock and assisting in making sales. He testified that he employed them to be and do so, paying one a stipulated monthly salary, and the other, who did less work, only as he needed him from time to time; but the appearance was not noticeably different from what it had been. In short, no proof whatever of any such difference, either in the service of the store or the conduct of its business, or in any visible sign or notice of ownership of the stock, was made or offered. The general statements that appellant took possession and that the business was thereafter conducted very differently, without any particulars other than those above

mentioned, must be regarded as of little or no weight, and we are of opinion that the jury might well have found a lack of the requisite change.

It was further claimed as ground for the impeachment of the sale that it was made by the vendors with intent to disturb, hinder, delay or defraud their creditors, and that the vendee is chargeable with notice of such intent.

It appears that their business had not been successful. According to their own statement, they had been selling for the last year without any profit, and were satisfied that they could not make any money in it. For that reason, as admitted by both the parties to it, the sale was proposed and made. The firm was largely indebted—to appellant himself, in $2,000 for borrowed money; to wholesale dealers and jobbers, for goods, in $5,000, of which something over $2,000 was then due and out of their power to pay. A little more than two months after the sale, they failed to pay or turn out anything on the small judgment of appellee, and suffered the execution to be levied. They sold the entire stock, which was all of their tangible property, for the sum of $9,000, considered to be about sixty per cent of the estimated invoice value, but really all it was worth or could be sold for, of which sum $1,000 was in appellant's verbal promise to pay in fifteen days, and $5,000 in his six or more unsecured notes, running from October, 1895, to some time, not shown, in 1896. At the time of the sale he canceled the $2,000 debt due him, and paid $1,000 in cash.

The inevitable effect of this sale to disturb, hinder and delay, if not also to defraud creditors of the vendors, is sufficiently illustrated by this case of the appellee. But for it, this debt would have been voluntarily paid on demand, at any time after it became due, or its satisfaction promptly compelled by the execution. But having, by means of it, disposed of all their property that could be so reached without their consent, they were enabled, although they had received its equivalent in cash and notes which could not be so reached, to defy this creditor, refuse to pay one dollar of its small but just claim, and subject it to the

further and needless expense and delay of this proceeding to obtain satisfaction. This the jury could readily see and understand.

These vendors are presumed to have had knowledge of this effect, and having chosen to avail themselves of it after the sale, may reasonably be further presumed to have intended it when they made the sale, and if made with such intent, it was, in view of the law, fraudulent on their part.

Appellant, the vendee, being also a creditor to the amount of $2,000, could lawfully receive from them so much of their stock specified as would fairly satisfy that claim, if he received it in good faith for that purpose, notwithstanding any fraudulent intent on their part with reference to other creditors and his knowledge of it. But of the residue, valued at $7,000 and not distinguished, he was strictly a purchaser; and if he had knowledge of such intent, or of circumstances that should have put him upon inquiry which would have led to it, his purchase was void as against appellee's execution and levy. Then did he have such knowledge?

He was their brother, knew their business had not been profitable and that they were in debt to others besides himself, but had no idea of the amount. Yet he never inquired. Their books showed it. He had been in the store much of the time for about eight months and had free access to them, but never looked to see. He bought their entire stock at the price of $9,000, and went in debt for two-thirds of it, without any inventory. He knew of what it consisted eight months before, but took their word alone for what they had since sold out and put in. He had no means "to speak of," as he expressed it, out of which to pay anything, except this stock. He made payment of the $1,000, within fifteen days after his purchase out of the proceeds of his sales.

Each of these statements was his own and uncontradicted. They clearly tend to show he should have inferred, that his vendors intended by the sale to obtain a

position in which they could hold off creditors and so secure settlements to their own advantage. It was a question for the jury, who, in our opinion, were properly and fairly instructed, and their finding should be conclusive.

In principle the case was like those of Hanchett v. Goetz, 25 Ill. App. 445; Goetz v. Hanchett, 40 Id. 206, and Oakford & Fahnestock v. Dunlap, 63 Id. 498.

Appellant testified that the rugs included in the levy were purchased from Marshall Field & Co., and put into the stock by him after the sale in question. But he was present at the time of the levy and did not so notify the constable. He is therefore estopped to claim them now. Goetz v. Hanchett, *supra*.

Perceiving no material error in the record, the judgment will be affirmed.