ALAN DREY COMPANY, INC., Plaintiff-Appellee, *v.* GENERATION, INC., Defendant—(McGRAW-HILL, INC., Citation-Defendant-Appellant.)

(No. 59320;

First District (2nd Division)—August 6, 1974.

*Rehearing denied October 9, 1974.*

George W. Hamman and Muriel B. Irwin, both of Mayer, Brown & Platt, of Chicago, for appellant.

Robert J. Meyers, of Barrett, Kiley and Meyers, of Chicago, for appellee.

Mr. JUSTICE STAMOS delivered the opinion of the court:

Plaintiff-appellee, Alan Drey Co., Inc. (hereinafter Alan Drey), recovered a judgment by confession against defendant, Generation, Inc. (hereinafter Generation) in March 1971, in the amount of $98,376. Shortly thereafter, defendant moved to vacate the judgment. While this motion was still pending and while all proceedings on the judgment were stayed, defendant, Generation, Inc., sold subscription lists to McGraw-Hill, Inc. (hereinafter McGraw-Hill), for $150,000 cash. After Drey's judgment against Generation had been confirmed and in a supplementary proceeding, plaintiff sought judgment against McGraw-Hill, citation-defendant, on the theory that the transfer by Generation was a fraudulent

conveyance and that McGraw-Hill, having notice of the fraudulent intent of the vendor, was a participant in the fraud. After a hearing, the trial court found that McGraw-Hill had notice of the fraudulent intent of defendant, Generation, in making said sale, and entered judgment against McGraw-Hill in the amount of $98,376. The vendee, McGraw-Hill, brings this appeal.

In rendering its decision the court premised its findings of fact upon the pleadings, documentation, affidavits, and the citation examinations of Stuart Handler, president of Generation, and Ralph Blackburn, an officer of McGraw-Hill. From the record, the following factual setting emerges:

In the course of its business, Generation, a business-magazine publisher, purchased lists of potential subscribers from Alan Drey, a list broker, and executed a promissory note in lieu of immediate payment. The note was subsequently defaulted, and on March 9, 1971, Alan Drey took judgment by confession against Generation in the amount of $98,376.68. Stuart Handler received a letter, dated March 10, 1971, from Alan Drey's attorney, warning the former that judgment had been confessed, execution placed with the sheriff, and that the judgment was then a lien on the assets of Generation. On March 19, 1971, Generation filed a motion to vacate the confessionary judgment, but no decision on the motion was made until subsequent to the events in question.

Thereafter, apparently Generation and Alan Drey unsuccessfully engaged in negotiations in attempting to reach some solution by which Generation could pay the monies due Alan Drey. Generation's financial difficulties continued and the last issue of the magazine was published in July 1971. Stuart Handler admitted that Generation was insolvent during the period March 9, 1971, through the date of the alleged fraudulent transfer, September 30, 1971, and that during the period July, August, and September 1971, the only substantial unencumbered asset owned by Generation was its customers' subscription lists of its "Generation Magazine."

In an attempt to raise money Generation commenced calling upon other people in the industry endeavoring to sell the names and addresses on its subscription and prospect list. In late July 1971, Stuart Handler contacted Ralph Blackburn, a representative of McGraw-Hill, and offered to sell the lists for $500,000. On August 5, 1971, Blackburn conferred with Handler regarding the possible purchase of the lists. On or about that same day, Blackburn, who had previously learned of the outstanding judgment through a Dun and Bradstreet report, called John E. McNichols, an officer of Alan Drey, to inquire whether the judgment was still effective. McNichols assured Blackburn that Alan Drey was still a judgment creditor of Generation. Blackburn also related to McNichols

that Handler had approached McGraw-Hill with an offer to sell the subscription list. Shortly thereafter, McNichols phoned Handler to find out "what was up." Handler assured McNichols that "they [Generation] are not going out of business nor are they selling."

Subsequent to the conference of August 5, a purchase price of $150,000 was agreed upon. On August 16, 1971, Blackburn sent a letter to Handler requesting that Generation and Handler, individually, protect McGraw-Hill from any claims in connection with the purchase of the lists; Blackburn admitted that he had Alan Drey in mind when he inserted the indemnity paragraph. The requested indemnification was not, however, given. Blackburn further admitted that he had reservations about the transaction, and at one point, inquired of an officer of the Continental Illinois National Bank and Trust Company regarding Generation's solvency. No definite answer was given. However, based upon his knowledge that the subject matter of the negotiations was the sole customers' subscription list of Generation, and upon his knowledge of Generation's desire to sell the same, Blackburn assumed that Generation was in severe financial straits. No officer or agent of McGraw-Hill ever asked for a list of Generation's creditors, and Blackburn admitted that no notice, other than the telephone conversation of August 5, was given to Alan Drey prior to closing the sale.

Stuart Handler admitted that he had requested Blackburn to keep the proposed sale confidential, and Blackburn told Handler that he would. The reason for keeping the negotiations confidential, Handler explained, was to obtain the best possible price for the lists, and also to prevent Generation's creditors from interfering with any proposed sale. Handler admitted that the sale of the lists put Generation out of the magazine publishing business.

Prior to the closing of the sale on September 30, 1971, Generation established a secret trust checking account at the First National Bank of Chicago, the legal title to which was held in the name of a law firm. At the closing of the sale, Generation received McGraw-Hill's check for $142,853.42, and at Handler's request, McGraw-Hill also delivered two other checks in the sums of $4,481 and $2,656 to other creditors of Generation. Immediately after the sale, Generation deposited the sale proceed in the secret trust account, and subsequently, some $40,000 from this account was used by Generation to purchase stock in a new business venture, the Allen Bennett Company, formed in July 1971.

Stuart Handler admitted that he acquired 45% of the shares in the Allen Bennett Company in his own name, and that Robert Tomarkin, another officer of Generation, received 45% of said shares in his own name, for which neither Handler nor Tomarkin paid any cash considera-

tion. The remaining 10% of the shares were registered in the name of Generation.

Apart from the $40,000, the remainder of the proceeds from the trust account was paid to general creditors, for back salaries, taxes, and general operating expenses. However, none of the proceeds were paid to Alan Drey, a judgment creditor. Handler explained that he was under the impression that, while the motion to vacate the confessionary judgment was still pending, Alan Drey was not considered a creditor; the record reveals that Generation's motion to vacate was not denied until January 21, 1972.

Citation-defendant's initial contention is that, because the statutes which govern supplementary proceedings require that a third party having an interest in the subject property be given a trial (see Ill. Rev. Stat. 1971, ch. 110, par. 73(5), ch. 62, par. 42), the procedure followed here below must be analogized to the procedure governing a motion by plaintiff for summary judgment. The predicate of defendant's argument is that, in rendering its decision, the trial court did not hear evidence presented in open court, but relied upon the pleadings, citation examinations, affidavits, and documents submitted by the parties. Defendant argues that since it was not afforded a trial, our standard of review is limited to a determination of whether the matters considered by the trial judge give rise to a genuine issue of material fact.

Plaintiff contends that a citation examination pursuant to Supreme Court Rule 277(e) (Ill. Rev. Stat. 1971, ch. 110A, par. 277(e)) adduces evidence, and that, therefore, the citation hearing was equivalent to a bench trial.

In *Meggison v. Stevens*, 21 Ill.App.3d 505, 316 N.E.2d 297 this court recently had occasion to pass upon the nature of a supplementary proceeding in relation to a third party who claims an interest in the subject property. In that case, citations to discover assets were issued against the judgment debtor and his wife. The testimony contained in the citation examinations revealed that the citation defendants, who owned a home in joint tenancy, gratuitously conveyed their interests in the property into a land trust of which the wife was the sole beneficiary. At the time of this transfer, the husband was indebted to a third party, but the debt had not yet been reduced to judgment. At the hearing, on the judgment creditor's subsequent petition for relief, supported by the citation examinations, the trial judge was about to enter his findings, when counsel for the wife objected that he had not as yet had any opportunity to place the judgment debtor on the stand. The judge referred to his impression that the matter had been submitted to him for his disposition on the pleadings and the citation examinations, and further took the

position that counsel had participated in the citation examination of the judgment debtor, where he had had full opportunity to obtain the testimony of the examinee. The court then entered its finding that the conveyance by the husband-judgment debtor to the land trust was a transfer made with the intention of defrauding creditors, and ordered that the wife execute an assignment of 50% of her beneficial interest in the land trust. On appeal, the wife alleged that she was denied an opportunity to establish her defense in that the trial court refused to permit her husband, the judgment debtor, to testify. In reversing the judgment, this court held:

> "The statutes and rules which govern supplementary proceedings all contemplate that a third party claiming an interest in the property involved must be given a 'trial * * * as in other civil cases'; hence, must be given a full opportunity to present and maintain his or her claim. See Ill. Rev. Stat. 1971, ch. 110, par. 73(5); ch. 110A, par. 277(e); ch. 62, pars. 42, 43. As a third party citation respondent and a defendant in plaintiff's subsequent petition for relief, appellant is in the position of a garnishee asserting her own property right in the subject premises.
>
> The record in this case shows that appellant was not afforded such an opportunity despite her request for it. Her citation examination does not itself constitute such an opportunity since such examination is simply a preliminary discovery proceeding which might elicit facts which could serve as the basis for a subsequent petition for relief, which, as to the third party, would constitute the initial pleading in the nature of a complaint. Appellant filed an answer which put the cause at issue.
>
> While the parties by agreement may stipulate the pleadings, citation examinations and evidence which may be considered by the court in resolving the issues before the court, the record in this case contains no evidence of any such agreement by the parties or their counsel, and trial counsel for appellant denied any such agreement and expressly asked to put on a witness for the appellant. We think it was error to refuse to permit him to do so, because such refusal denied appellant as a third party a 'trial * * * as in other civil cases.' 21 Ill.App.3d 505. See *Roy Strom Excavating & Grading Company v. National Bank of Albany Park* (1972), 4 Ill.App.3d 561, 281 N.E.2d 427.

■■ In the present case, as in *Meggison,* the trial judge acted in the belief that the parties had submitted the case to him for disposition on the record; and, similarly, the judgment order reveals that the "request of McGraw-Hill, Inc. to present further evidence" was denied. However,

there are significant procedural differences in the instant case which distinguish it from the holding in *Meggison*. In *Meggison*, we noted that the parties by agreement may stipulate to disposition of the issues based upon the pleadings, citation examinations, and other evidence. Here, an agreed order, dated July 13, 1972, and signed by Generation, McGraw-Hill and Alan Drey, provided that the citation examinations were to be filed in "connection with the Petition and in connection with the Citation Proceedings," and further provided for the setting of a hearing date. At the hearing, the report of proceedings reveals that the trial court had (1) considered the matter as submitted by stipulation, and (2) rendered a decision in its capacity as trier of fact. Although counsel for McGraw-Hill participated in a colloquy after rendition of the decision, no complaint was made about the fact that the trial judge had officiated in its capacity as trier of fact, or that McGraw-Hill had been denied an opportunity to present its defense. From the record, it appears that the only time counsel for McGraw-Hill took any affirmative action in this regard, was at a time subsequent to the hearing in which the findings were made. The judgment order recites that "the *request* of Defendant, McGraw-Hill, Inc. to present *further evidence* be and the same is hereby denied." (Emphasis added). We note that the word "request" was substituted for the word "motion"; nowhere in the common-law record or report of proceedings do we find any motion by defendant, either oral or written, to present further evidence. Moreover, the words "further evidence" imply that defendant had regarded the previous submission of the citation examinations as evidence, and not merely as discovery. In light of the agreed order signed by the parties, defendant's failure to object when it knew the court was functioning as the trier of fact, and the wording of the judgment order itself, we think defendant's contention is dissimilar from that made in *Meggison*. Here, the agreed order fairly indicated to the parties and the court that the cause was submitted for final disposition; yet McGraw-Hill made no objection until after a decision on the merits had been rendered. A party on appeal may not urge error committed in pursuance of his stipulation and acquiescence in the proceedings and upon which the lower court was induced to act. (See *Powley v. Dorland Building Co.* (1939), 281 N.Y. 423, 24 N.E.2d 109.) The "request" here came too late to vitiate the purport and effect of the order agreed to by the parties. As we view the proceedings below, the cause was submitted for disposition upon agreed facts, with the parties disputing the inferences to be drawn from the facts and the law applicable thereto. Accordingly, the only question on review is whether the facts as stipulated sustain the judgment of the trial court. *Castle Concrete Co. v. Fleetwood Associates*, 131 Ill.App.2d 289, 268 N.E.2d 474.

Under our Statute of Frauds a conveyance is void as against creditors if it is shown that the transfer was made with the intent to disturb, delay, hinder or defraud creditors (Ill. Rev. Stat. 1971, ch. 59, par. 4), and, in the case of a purchaser for valuable consideration, that the purchaser had notice of the fraudulent intent. Ill. Rev. Stat. 1971, ch. 59, par. 5.

■■■ The question of fraudulent intent (or lack of good faith) is a question of fact, which must be established by extrinsic proof. Direct evidence is not essential, however, for said intent may be established by circumstances which indicate its existence. (*Thompson v. Williams*, 6 Ill.2d 208, 127 N.E.2d 457.) Among the factors which have come to be recognized as indicia of fraud and the lack of good faith are the following: (1) the debtor is insolvent at the time of conveyance or is rendered insolvent by the conveyance (*Thompson v. Williams, supra*.); (2) a conveyance after judgment and while a stay of proceedings is in force (37 C.J.S. *Fraudulent Conveyances* § 82 (1943); See *Phillips v. Kesterson*, 154 Ill. 572, 39 N.E. 599); (3) a secret trust created in favor of grantor (*Sherwin-Williams Co. v. Watson Industries Inc.*, 277 Ill.App. 585); (4) a reduction of substantially all assets for cash (*Hanchett v. Goetz*, 25 Ill.App. 445); and (5) debtor sells his only unencumbered *asset* (Boies v. Henney, 32 Ill. 130).

These indicia or "badges of fraud" are not conclusive of fraud, but merely afford a basis from which its existence may be properly inferred. They are strong or weak according to their number and concurrence along with other attendant circumstances. (*Zwick v. Catavenis*, 331 Ill. 240, 162 N.E. 869.) Although the inferences to be drawn from such indicia may be overcome by establishing the *bona fides* of the transaction, where the conclusion necessarily follows that the particular conveyance was made with the fraudulent intent to delay, hinder or defraud creditors, it can make no difference that, with such purpose existing, there were combined other motives at the time of making the conveyance. *Phillips v. Kesterson, supra.*

Looking to the present cause, we hold that the evidence in the record is sufficient to support the finding that Generation intended to hinder, delay or defraud the plaintiff. In so holding we note that the circumstances surrounding the transfer exemplify various indicia of fraud from which a finding of fraudulent intent may be inferred. In this regard, the evidence reveals that Generation was insolvent when the confessionary judgment was procured and that the company continued to be insolvent prior to and at the time of the sale to McGraw-Hill. During this same period of time, Generation knew that plaintiff was a judgment creditor and instituted action which stayed the proceedings and any possible execution. While the proceedings were stayed, Generation negotiated for the sale of its sole substantial asset, the subscription lists, for cash; the

effect of such sale would be to place Generation out of the magazine-publishing business. Further, at a time when Generation and McGraw-Hill were negotiating the sale, Handler affirmatively represented to an officer of the plaintiff that no sale of the lists was contemplated by Generation nor was Generation contemplating going out of business. However, on September 30, 1971, the subscription lists were sold for cash, the larger part of which was deposited in a secret trust account. Subsequently, some $40,000 was diverted from the trust account as an investment in a new business venture with the principal officers of Generation, Stuart Handler and Robert Tomarkin, individually owning 90% of the common stock of the venture.

■■ The sum total of this factual setting depicts a secretive transaction the effect of which was to convert Generation's only substantial asset into cash which could be more easily placed beyond the reach of creditors. (See *Hanchett v. Goetz, supra.*) We cannot say, as a matter of law, that the trial court erred in finding that Generation conveyed said asset with the intent to hinder, delay, or defraud the plaintiff.

■■ Merely showing a fraudulent intent on the part of the transferor is insufficient, however, to impose liability on the transferee. The transferee must be a participant in the fraud rather than a *bona fide* purchaser. To constitute a *bona fide* purchaser from a fraudulent transferor, he must have purchased the property for valuable consideration, without notice of the fraud, and he must be innocent of any purpose to further the fraud, even to protect himself. (Ill. Rev. Stat. 1971, ch. 59, par. 5; 20 Ill. L. & Pr. *Fraudulent Conveyances* § 192 (1956), and cases cited therein.) To be regarded as a participator in the fraud, it is not necessary that the purchaser have actual knowledge of the debtor's fraudulent intent, but merely a knowledge of facts and circumstances sufficient to excite the suspicions of a prudent man and be put on inquiry, or to lead a person of ordinary perception to infer fraud. *Hanchett v. Goetz, supra.*

As to the transferee, McGraw-Hill, the record reveals that Blackburn, an officer of McGraw-Hill, had knowledge of the outstanding judgment against Generation prior to his first meeting with Handler on August 5, 1971; he also had knowledge that the judgment arose in connection with Generation's purchase of the lists of potential subscribers from Alan Drey. During the course of the August 5 meeting, Blackburn mentioned the Alan Drey judgment and Handler responded by stating that his legal counsel was attempting to have it "thrown out of court." At the same meeting, Blackburn agreed to keep the negotiations confidential. Blackburn was aware that Generation was in "severe financial straits" in August of 1971, and Handler testified that Blackburn "sensed or knew that we were in trouble * * * that we had to sell and sell quickly at a

price that we could get." On August 6, Blackburn called Jack McNichols, an officer of Alan Drey, stated that he had been approached by Generation with an offer to sell the lists, and inquired if the judgment was still effective. McNichols assured Blackburn that the judgment was still effective. Subsequently, Blackburn conferred with McGraw-Hill's legal counsel concerning the Alan Drey judgment; although no "decision" was made concerning the possible effect of the judgment on the purchase of the lists, counsel for McGraw-Hill did advise that indemnification should be requested to protect McGraw-Hill from any "claims" in connection with the purchase of the subscription lists. Blackburn admitted that he had Alan Drey in mind when he requested the indemnity provision.

In light of the foregoing, we conclude that the evidence sufficiently supports the finding that McGraw-Hill knew or should have known of Generation's fraudulent intent and was not a *bona fide* purchaser within the meaning of section 5 of "An Act to revise the law in relation to frauds and perjuries" (Ill. Rev. Stat. 1971, ch. 59, par. 5). McGraw-Hill, in arguing the *bona fides* of the transaction on its part, relies upon the fact that Blackburn telephoned McNichols and informed him that Generation had approached McGraw-Hill with an offer to sell the subscription lists. However, the notice imparted to Alan Drey was merely that a preliminary offer was made, and was followed by an inquiry as to the validity of the Alan Drey judgment. No attempt was made by Blackburn, either during the telephone conversation or any time subsequent thereto, to ascertain Alan Drey's position should McGraw-Hill decide to purchase the lists. In fact, the natural inference drawn from the telephone conversation is that McGraw-Hill, having verified the existence of the judgment, would no longer be interested in the purchase of the lists. No further inquiries were made despite the fact that McGraw-Hill knew of the judgment, knew that it arose in connection with the sale by Alan Drey of lists of potential subscribers to Generation, knew that Generation was in financial difficulties, and knew that Generation wanted to keep the sale "confidential." Furthermore, it cannot be argued that McGraw-Hill, armed with such knowledge, labored under the impression that the sale would be entirely proper. The testimony reveals that McGraw-Hill had serious misgivings about the proposed purchase, yet made no attempt to inform Alan Drey of its course of action. Under these circumstances, we cannot say that the telephone conversation between Blackburn and McNichols established, *as a matter of law,* the *bona fides* of the transaction. Accordingly, the judgment is affirmed.

Judgment affirmed.

HAYES, P. J., and LEIGHTON, J., concur.