**UNITED STATES of America, Plaintiff,**

v.

**Therese C. BROWN, Defendant.**

**No. 91 C 2771.**

United States District Court, N.D. Illinois, E.D.

April 27, 1993.

Charles J. Cannon, U.S. Dept. of Justice, Washington, DC, for plaintiff.

Theodore A. Sinars, John J. Jiganti, Madden, Jiganti, Moore & Sinars, Chicago, IL, for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

SHADUR, Senior District Judge.

This Court has conducted a bench trial in this action, following which counsel for each of the parties has submitted revised proposed findings of fact and conclusions of law. In accordance with Fed.R.Civ.P. ("Rule") 52(a), this Court makes the following findings of fact ("Findings") and states the following conclusions of law ("Conclusions"). To the extent (if any) that the Findings as stated may be deemed conclusions of law, they shall also be considered Conclusions. In the same way, to the extent (if any) that matters later expressed as Conclusions may be deemed findings of fact, they shall also be considered Findings. In both those respects, see *Miller v. Fenton*, 474 U.S. 104, 113–14, 106 S.Ct. 445, 451–52, 88 L.Ed.2d 405 (1985).

### Findings of Fact

1. This action involves a claim by the United States that on September 8, 1984 the late Edward J. Brown ("Edward") fraudulently conveyed his interest in an Illinois land trust to Therese Brown Rubey ("Therese") at

a time when Edward was indebted to the United States and was left insolvent by the transfer. If the United States is correct in its claim, Edward's transfer to Therese is voidable under Ill.Rev.Stat. ch. 59, ¶ 4 ("Act ¶ 4").

2. Edward and Therese were married to each other twice, the first time on October 26, 1957. They had four children: Victoria Ann (born July 28, 1959), Vallerie Jo (born March 21, 1961), Vivienne Marie (born September 8, 1963) and Edward, Jr. (born July 19, 1965). That first marriage ended in a divorce decree that was entered on June 29, 1976. During that marriage Edward and Therese and their children lived in the marital home in Des Plaines, Illinois, title to which was held in an Illinois land trust.

3. Therese was a high school graduate and attended Mundelein College and Loyola University, although the record does not reflect that she received a degree from either institution. (Tr. 42). Throughout her childhood and high school years Therese participated in the operation of various family-owned enterprises that operated one or more newsstands and a newspaper distributorship in the Chicago area (Tr. 42–43). In 1965 or 1966 Therese and her sister Roseanne Hudson acquired the Des Plaines News Agency (Tr. 43–44).

4. From 1960 and at various times during his marriage to Therese, Edward was self-employed in a variety of enterprises: a landscape business, a janitorial business, a security company and ultimately the business of establishing and operating the predecessors to health maintenance organizations (Tr. 45–47). During that same period Therese continued to be employed in the operation of her family's businesses.

5. In 1975 Therese filed an action against Edward in the Circuit Court of Cook County for separate support on the ground that he had deserted her on or about November 10, 1974. In that action Therese was represented by Ralph Goren ("Goren") (Tr. 47), who had been Edward's lawyer in the past (Goren Dep. 11).

6. On February 10, 1976 Edward and Therese entered into a property settlement (the "Settlement Agreement," J. Ex. 8 [1]) in connection with the pending support action, which was thereafter converted by agreement to a divorce action (Tr. 49–50). Under the terms of the Settlement Agreement:

(a) Edward agreed to pay Therese $1500 per month in alimony and to transfer to her (1) his interest in the marital home, (2) any interest he may have had in a partnership known as "The Paper Mill" and (3) the life insurance policies upon his life (on which he agreed to pay the premiums).

(b) Therese agreed to transfer to Edward her shares of stock in a corporation known as National Health Corporation and to accept the provisions of the Settlement Agreement in full satisfaction of her and her children's rights to support and maintenance.

7. At the time that the Settlement Agreement was signed, neither Edward nor Therese had any interest in a parcel of improved commercial real estate located at 985 Graceland Avenue, Des Plaines, Illinois (the "Graceland Property"). It is the later-acquired Graceland Property that is the subject matter of the alleged fraudulent conveyance that is in turn the subject of this litigation.[2]

8. On April 30, 1976 Therese and Edward filed a stipulation with the Circuit Court of Cook County stating that Therese's previously-filed complaint for separate support could be heard as a divorce action. On the same day Therese filed an Amended Complaint for Divorce (J.Ex. 4) in that court as Docket No. 75 D 27994, seeking a divorce from Edward on the ground of desertion. At that time neither Edward nor Therese had yet acquired any interest in the Graceland Property. Therese continued to be represented by Goren in the divorce proceedings, while Edward did not have legal counsel representing him.

---

**1.** All exhibits in the record have been given joint designations by the parties and are referred to here as "J.Ex.—."

**2.** To be more precise, the allegedly fraudulent conveyance involved the beneficial interest in the land trust holding title to that real estate.

9. On that same April 30, 1976 date Therese and Goren appeared before the Circuit Court of Cook County for a hearing on her divorce complaint (that date was some 4½ months after the signing of the Settlement Agreement, nearly 2 months after the divorce hearing and about a week before entry of the divorce decree). Edward was not present at the hearing and had executed a stipulation waiving his presence. Therese testified at the hearing (J.Ex. 6) about her marriage to Edward, about his desertion (she stated that he was then living in Minneapolis, Minnesota) and about the terms of the Settlement Agreement.

10. At the hearing the Circuit Court Judge reviewed the terms of the Settlement Agreement with Therese, inquiring specifically about Edward's agreed-upon monthly payment of $1500 and the parties' understanding that the amount would constitute unallocated child support and alimony. As the result of the hearing the court approved the Settlement Agreement (except for its Paragraph 1, which had stated that the $1500 monthly payments were to be considered alimony alone). When the divorce decree was formally entered by the court on June 29, 1976, the Settlement Agreement was incorporated into the decree (J.Ex. 7).

11. On June 21, 1976 Edward entered into a contract (the "Purchase Contract," J.Ex. 48–2) to purchase the Graceland Property, agreeing to pay the $175,000 purchase price to the seller, 985 First Avenue Building Corp. Under the Purchase Contract the seller agreed to take back, representing part of the purchase price, a $20,000 note from Edward payable in or within two years, to be secured by a second mortgage. Only Edward was identified in the Purchase Contract as the purchaser of the Graceland Property, and only Edward signed that document. Neither Therese's name nor her signature appears anywhere in the Purchase Contract. Indeed, Therese testified at trial that she had never seen the Purchase Contract before (Tr. 67).

12. On July 6, 1976 (well after the Settlement Agreement had been approved by the court and a week after the final decree of divorce had been entered) Edward entered

into a land trust agreement (the "Trust Agreement," J.Ex. 21) with the First National Bank of Des Plaines ("Bank") to take title to the Graceland Property on the closing of the Purchase Contract. Under the Trust Agreement (Bank's Trust No. 61771574), Edward was named as the sole beneficiary of the land trust and the sole holder of the power of direction as to the Graceland Property. Under the terms of the Trust Agreement, no assignment of any beneficial interest was binding upon Bank as Trustee until the original or a duplicate of the assignment was lodged with Trustee and until its acceptance was indicated thereon.

13. On July 19, 1976 the closing with respect to the Graceland Property took place, with title being conveyed to Bank as Trustee of its Trust No. 61771574. Bank as Trustee executed two installment notes in bearer form (one for $130,000 and the other for $20,000), as well as a deed of trust in favor of Chicago Title & Trust Company to secure the payment of the $130,000 note. In addition the seller took back a $20,000 purchase money second mortgage. Only the seller and Edward (who alone was identified as the buyer) signed the closing statement executed in connection with the transaction (J.Ex. 22). Neither Therese's name nor her signature appears anywhere on the closing statement, nor did she sign any contract, note or mortgage in connection with the 1976 acquisition of the Graceland Property. Therese testified that she came up with the cash required for the closing with funds from the Des Plaines News Agency, while Edward contributed no money to the purchase (Tr. 148). But she produced no supporting documentary evidence whatever, and the closing statement credits Edward with both the $17,500 earnest money deposit and the cash to balance. This Court cannot and does not credit Therese's testimony.

14. Therese testified that she and Edward executed a guaranty (J.Ex. 20) in connection with the 1976 acquisition of the Graceland Property. That purported guaranty is on blank paper and is undated, and it recites that they guarantee the payment of "the attached note, which bears Chicago Title and Trust Company identification number

\_\_\_\_." In fact neither of the notes executed by Bank in connection with the purchase of the Graceland Property bears a Chicago Title & Trust Company identification number. Although the purported guaranty refers to a "note," the identity of the note to which the guaranty refers cannot be determined because of the blank space where an identification number is normally inserted. Finally, Therese could not recall at trial when or where she signed the guaranty (Tr. 145–46).

15. On balance this Court is unpersuaded that the purported guaranty was in fact executed and delivered to Bank at or near the time of the acquisition of the Graceland Property.[3] But even if it had, that would not call for the conclusion that Therese rather than Edward purchased the Graceland Property in 1976. Such a guaranty, like the addition of Therese's signature to the mortgage disbursement statement referred to in Finding 16(b), would be entirely consistent with customary lender practices. In light of the proximal time relationship between the final divorce decree (as well as Edward's noninvolvement in the divorce proceedings), coupled with the facts that (1) Edward and Therese continued their business relationship through Therese's management of the Graceland Property (and her business' occupancy of a substantial part of that property) for years thereafter and (2) they apparently continued an amicable personal relationship until Edward's death,[4] it would not be surprising if Bank had been wholly unaware of the existence of the final divorce decree and had thus viewed the requirement that Therese's signature also be obtained as the kind of documentation that is normally secured from the spouse of a purchaser. But these Findings are not based on any speculation in that respect. Instead any inference favorable to

Therese that might arguably be drawn from her signature (if, that is, she had in fact signed and delivered the guaranty—an unproved assumption) is far outweighed by the evidence indicating that she was *not* the purchaser of the Graceland Property.

16. Therese testified that Edward had no interest in the Graceland Property in 1976 (Tr. 105–06). In that and other respects she was not a credible witness. Moreover, her testimony in that regard is belied by more than one aspect of the record:

(a) Although Goren testified that he was representing both Edward and Therese at the closing (Goren Dep. 18), that revisionist reconstruction of the situation is also not really credible. For the most part Goren had no real recollection of the events of that period, such as the terms of the Settlement Agreement and what transpired during the divorce proceedings (*id.* 12–16). What *is* clear is that Goren was really Edward's lawyer, having represented him before Goren was called on to handle the marital dissolution (*id.* 11).[5] Perhaps most telling is Goren's description of his typical lawyer-client relationship with *Edward*—and of how that also applied to the acquisition of the Graceland Property (*id.* 17–18):

If I recall correctly, this building was purchased after the divorce was final.

Mrs. Brown at that time executed guarantees and signed various documents required by the lender. Mr. Brown, as was his normal course of business, would have called me the day before and said come to the closing. And I would say what closing and what's happening. "Show up" is what he would say.

3. In response to a subpoena duces tecum requesting all documents relating to the Land Trust, Bank responded that it had none (Tr. 146–48). Again the record is devoid of any documentary evidence—any objective facts—to corroborate Therese's unsupported testimony.

4. Indeed, over the post-divorce years Therese received very substantial salaries from Edward's businesses. At least after she sold the Des Plaines News Agency in 1980, those salaries and her $18,000 a year alimony provided by far the

largest part of her not inconsiderable income (see, e.g., J.Ex. 12–14).

5. It is not at all unusual in a friendly uncontested divorce for the lawyer for one spouse (frequently for the husband) to act nominally for the other spouse. That arrangement (remember that Goren had been *Edward's* lawyer in the past) is entirely consistent with Edward's total noninvolvement in the divorce proceedings—either personally or through counsel—after the Settlement Agreement had been worked out.

Mr. Brown was not long on giving specific directions for information. So, I went to a closing. There was a closing. I did not prepare the trust document, all I did was attend the closing.

(b) What has been set out in Findings 15 and 16(a) explains the existence of the mortgage disbursement statement prepared on Goren's letterhead and produced from his files. That document does contain both Edward's and Therese's signatures. But over and above the document's patent *inconsistency* with Therese's current assertion that Edward had *no* interest in the Graceland Property in 1976, it is entirely *consistent* with this Court's determination that Edward and not Therese was the purchaser of the property and that Therese was no more than an accommodation party to any papers that she was called upon to sign.

17. In summary, this Court finds no credible evidence that Therese purchased the Graceland Property in 1976 for value as she has claimed. Instead this Court finds that Edward was the sole purchaser of that property, as is reflected in all of the operative documents (the Purchase Contract, the Trust Agreement and the closing statement).[6]

18. After Edward acquired the Graceland Property in 1976, Therese managed it. In connection with that operation, she established a checking account under the name "The Building Company" on which she and an employee of the Des Plaines News Agency were signatories. Therese testified that she thought but wasn't positive that Edward was also a signatory on the account (Tr. 79–80).

19. Rents from the various tenants, including the businesses operated both by Therese and by Edward, were deposited into the Building Company account. Therese used those rents to pay the expenses associated with the operation of the building, including such items as real estate taxes, snow removal and utility expenses (Tr. 78–79).

20. It was not until the preparation and filing of her individual tax return for the year 1979 (some four years after Edward's 1976 purchase of the Graceland Property) that Therese sought to claim the income and expenses associated with that Property (J.Ex. 11).[7] That return was prepared by accountant Leonard Blatt (Tr. 86–87), who has written a memorandum to Therese stating that the 1979 return was the first return in which Therese claimed any expenses associated with the property (J.Ex. 26). That 1979 return contained a handwritten Schedule E reporting that Therese acquired the Graceland Property in 1979 (not 1976). Another part of the return was a depreciation schedule on the Graceland Property claiming $5,833 per year on a straight-line method (J.Ex. 11, Tr. 89–90).

21. Therese's income tax returns filed for the years 1980 (when she sold the Des Plaines News Agency) through 1982 continued to report that she had acquired the Graceland Property in 1979, not in 1976 as she now claims (J.Exs. 12–14). That 1982 return was filed in 1983, some seven years after Edward's 1976 purchase of the Graceland Property.

22. In 1982 Therese's 1979 income tax return was audited by the Internal Revenue Service, and she engaged attorney Eugene Mahoney ("Mahoney") to represent her (Tr. 100–01). Mahoney then prepared and Therese filed an amended 1979 income tax return dated April 6, 1982 (Form 1040X) as a claim for refund with respect to the tax year 1979 (Tr. 90–91, 97; J.Ex. 50–7).

23. On August 13, 1982 Mahoney wrote to the IRS (J.Ex. 28), stating that Edward had made a *gift* of the Graceland Property to Therese after he acquired the Graceland Property (without specifying when the claimed gift had taken place) and that Therese had not purchased the property in

---

6. It is true that the Graceland Property was acquired to house Therese's and her sister's business as its principal tenant, as well as providing a business location for unrelated tenants (and later for Edward's business). But that too was all of a piece with the way in which Edward and Therese continued their relationship (including his provision of financial support for her and the children) after the amicable divorce.

7. For that year the real estate generated a net taxable loss (after the depreciation charge referred to later in this Finding) of over $4,500.

1979. Then as now Therese was presenting whatever version of events would put the best face on what her current interests appeared to call for. Certainly the letter is contrary both (a) to Therese's current claim that she *purchased* the Graceland Property in 1976 and (b) to the Schedule E acquisition date of 1979 that she had represented on her income tax returns for the years 1979 through 1982.

24. In April 1982, also in connection with the ongoing audit of Therese's 1979 tax return, Edward purportedly executed an assignment of his beneficial interest in the Land Trust (J.Ex. 29). That assignment, prepared by Mahoney, was never lodged with Bank as trustee. Indeed, the whereabouts of the original document is unknown (Tr. 119). During her deposition Therese testified as to that purported assignment, "I don't know if that first one really had been done" (Tr. 120). Moreover, on April 5, 1982 Bank as Trustee of Trust No. 61771574, certified—at Edward's request—that Edward was the sole beneficiary of the Land Trust (J.Ex. 30).

25. In an August 15, 1984 affidavit submitted to the IRS in connection with the ongoing audit of her 1979 income taxes, Therese stated that Edward "intended to convey the premises [Graceland Property] to the transferee [identified as Therese] on or about the time of their divorce on June 29, 1976" (J.Ex. 32). That statement too is contrary to Therese's present claim that she purchased the Graceland Property for value in 1976, and is thus still another manifestation of her willingness to assert any version of events that serves her best interests at the time that she advances such an assertion. It was only beginning with her income tax return filed in 1983 (the first return that she filed after Mahoney had sent the August 13, 1982 letter referred to in Finding 23) that Therese for the first time represented that she had acquired the Graceland Property in 1976 (J.Exs. 15, 16, 17).

26. On June 29, 1984 Therese executed an exclusive authorization to a real estate firm to lease space in the Graceland Property (J.Ex. 33). Although that form spoke of the "Owner" and Therese signed on the "Owner" line, that usage simply reflected the terminology of the broker's pre-prepared printed form, in which the party granting the exclusive authorization "warrants he is the Owner of record or has the authority to execute this Agreement." No weight is ascribed to the execution of that form by Therese, who was unquestionably managing the Graceland Property at the time—the document is not probative evidence that she was then in fact the owner.

27. Some time in mid to late 1984 Edward became seriously ill with cancer. According to his death certificate, the disease had an onset approximately five months prior to his death on December 11, 1984 (J.Ex. 43). As later Findings reflect, that illness restored the relationship between Edward and Therese to the extent that they actually remarried shortly before his death.

28. In September 1984 Edward made an assignment of his 100% beneficial interest in the Land Trust to Therese (J.Ex. 34). Therese acknowledges that she paid no consideration to Edward for that transfer (Tr. 121). Unlike the purported assignment that had assertedly been signed some time in April 1982 in Mahoney's office, the September 1984 assignment was acknowledged by Bank on September 8, 1984 (J.Ex. 34).[8] Before September 1984 no assignment by Edward of any beneficial interest in the Land Trust or of the power of direction as to the Graceland Property was ever lodged with or acknowledged by Bank (J.Exs. 21, 30, 34). Based on the clear weight of the evidence, this Court finds that before September 8, 1984 Edward was the sole owner of the beneficial interest in the Land Trust.

29. On October 15, 1984 Therese (who was now the sole beneficiary of the Land Trust) entered into an exclusive agency

---

8. J.Ex. 34 is somewhat confusing as to its date, in that the assignment by Edward and the acceptance by Therese both carried a typewritten date of September 11, 1984 while Bank's acknowledgement of receipt (which must of course take place after the assignment and acceptance are completed) shows a typewritten date of September 8 (three days earlier). Because the difference in dates makes no difference in the result, these Findings will use the Bank's date as presumptively reliable.

agreement with Wm. L. Kunkel & Co. of Des Plaines, Illinois under which she offered the Graceland Property for sale at a price of $245,000 (J.Ex. 72). Therese testified that she assumed she had arrived at the offering price as the result of an appraisal by that real estate firm (Tr. 125).

30. Not long after he had executed the September 1984 assignment of his beneficial interest in the Land Trust (more precisely, in late October 1984), Edward was hospitalized. On November 16, 1984 Therese and Edward were remarried in a ceremony performed in Edward's hospital room (J.Ex. 42), and on that same day Edward executed his last will and testament (J.Ex. 45).

31. On December 11, 1984 Edward died of cancer at the age of 52 (J.Ex. 43). That was only three months after he had executed the assignment of beneficial interest in the Land Trust to Therese and the assignment had been lodged with and acknowledged by Bank as trustee.

32. On July 30, 1985 Therese was appointed the personal representative of Edward's estate by the Circuit Court of Cook County (J.Ex. 45). On the petition for probate that Therese filed with the Circuit Court, she did not list any assets of Brown's as having any value (*id.*).

33. During the course of the probate proceedings, a number of claims were presented to the Circuit Court by parties asserting themselves to be Edward's creditors (J.Ex. 45):

(a) By agreement of Therese in her capacity as Executrix, on December 2, 1985 the Circuit Court allowed the claim of Marine Bank, N.A. ("Marine Bank") for $65,266.75, based on Edward's February 25, 1981 guaranty to Marine Bank of lease payments of $2,228 per month for 60 months by Delaware Professional Services, Inc. ("Delaware") under an equipment lease of the same date. On September 8, 1984 Edward was liable to Marine Bank on that guaranty.

(b) Union Bank & Trust Company of Minneapolis, Minnesota ("Union Bank") filed a claim in the amount of $81,508.94, which was neither allowed nor denied by the Circuit Court. Union Bank predicated liability for that claim on Edward's execution of a July 1, 1982 guaranty of a promissory note in the amount of $90,000 executed by Delaware on the same date. On September 8, 1984 Edward was potentially liable to Union Bank on that guaranty as well.

34. On September 8, 1984 Edward was also indebted to the United States for substantial amounts of unpaid federal taxes in addition to the amount later referred to in Finding 36:

(a) income taxes for the year 1981 in the amount of $32,800 plus statutory accruals (as of September 23, 1992 the unpaid balance of the 1981 tax year assessments against Edward was $67,154.90, as set forth on the Certificate of Assessments and Payments (IRS Form 4340) (J.Ex. 1));

(b) income taxes for the year 1982 in the amount of $10,130 plus statutory accruals (as of September 23, 1992 the unpaid balance of the 1982 tax year assessments against Edward was $15,324.15, as set forth on the Certificate of Assessments and Payments (J.Ex. 2)); and

(c) a 100% penalty assessed pursuant to 26 U.S.C. § 6672 in the amount of $72,492.82 for unpaid federal withholding taxes due from National Health Corp. of Michigan for the quarters ended March 31, 1983 and March 31, 1984, plus statutory accruals to the date of transfer (as of December 18, 1992, the unpaid balance of the assessments against Brown for the 100% penalty was $74,993.71, as set forth on the Certificate of Assessments and Payments (J.Ex. 3).

None of those tax liabilities has ever been paid.

35. On September 11, 1985 Therese, in her capacity as the Executrix of Edward's estate, filed a federal estate tax return (Form 706) with the IRS (J.Ex. 44). That return reported that Edward's debts totaled $334,820, of which $274,820 represented a judgment that had been obtained by the United States against Brown, but that return did not reflect Edward's tax liabilities referred to in Finding 34.

36. What the estate tax return referred to was a judgment entered by this Court in Civil Action No. 80 .C 5620 on motion of the United States for summary judgment. That liability arose out of assessments against Edward as a person responsible pursuant to 26 U.S.C. § 6672 for unpaid federal withholding taxes for the second and third quarters of 1970 and for all four quarters of 1982. Judgments in the respective amounts of $239,184.41 for 1970 and $35,635.57 for 1982 had been entered by this Court on October 31, 1983, less than ten months before Edward transferred his interest in the Land Trust to Therese on September 8, 1984. Those judgments have also never been paid.

37. After Therese first listed the Graceland Property for sale in October 1984 at a $245,000 listing price (see Finding 29), the property remained on the market until September 15, 1985, when Therese signed an agreement to sell the property for $220,000 (J.Ex. 60). On November 19, 1985 Therese closed the sale of the Graceland Property to Frederick T. and Carol A. Mosiman for that $220,000 price (J.Ex. 63). After payment of various liens, mortgages, taxes and charges, Therese received the net sum of $105,709.70 as a result of the sale (id.).

38. On September 8, 1984 the fair market value of the Graceland Property was not less than $220,000. Edward's transfer of his 100% interest in the Graceland Property to Therese on that date was made for no consideration (Tr. 121) and rendered Edward insolvent, leaving him with insufficient assets with which to pay his creditors. Edward made the September 8, 1984 transfer to Therese of his 100% beneficial interest in the Land Trust with the intent to disturb, delay, hinder or defraud the United States with respect to the collection of the tax liabilities that Edward owed on that date.

39. Before Therese executed the agreement to sell the Graceland Property on September 18, 1985 she knew (as evidenced by the federal estate tax return that she had signed one week earlier) that Edward's un-paid indebtedness was at least in the amount referred to in Finding 35 (including an indebtedness to the United States in an amount not less than $274,820) and that Edward's transfer to her of the Graceland Property held in the Land Trust on September 8, 1984 had rendered Edward insolvent (J.Ex. 44).

## Conclusions of Law

1. This Court has jurisdiction of this action under 28 U.S.C. § 1345.

2. In this action to set aside a conveyance on September 8, 1984 as fraudulent as to the United States as a creditor, the applicable statutory provision is the now-repealed Ill. Rev.Stat. ch. 59, ¶ 4 ("Section 4"):

> Every gift, grant, conveyance, assignment or transfer of ... any estate, real or personal ... made with intent to disturb, delay, hinder or defraud creditors or other persons ... shall be void as against such creditors, purchasers and other persons.

See this Court's opinion in *United States v. Kitsos,* 770 F.Supp. 1230, 1235 & n. 13 (N.D.Ill.1991).[9]

3. There is no limitations period specified in Section 4. But in any event the United States would not be barred by any applicable Illinois statute of limitations by reason of the rule *quod nullum tempus occurrit regi* (*United States v. Tri–No Enterprises, Inc.,* 819 F.2d 154, 158 (7th Cir.1987) and cases cited there).

4. When a conveyance is rendered void as to creditors under Section 4 (which is the statutory equivalent of the equitable remedy for conveyances in fraud of creditors of the transferor), a creditor may set aside the transfer and may elect to recover either the property itself or its cash value in satisfaction of the debt (*Tcherepnin v. Franz,* 489 F.Supp. 43, 45 (N.D.Ill.1980); and see 19A I.L.P. *Fraudulent Conveyances* ("I.L.P.") § 123, at 441 (1991)).

5. Section 4, which requires a showing of specific *intent* on the transferor's part, rep-

9. As *Kitsos* points out, the superseding statute (Ill.Rev.Stat. ch. 59, ¶¶ 101–112) has been applied retroactively by the Illinois courts in terms of granting equitable relief. But it makes no difference whether the same principle would apply in a suit such as this for money damages, because the result here would be the same under the new statute as under Section 4.

resents only one branch of the Illinois law of fraudulent conveyances—covering those categorized as fraudulent in fact. But there is another category that leads to the same result—that covering conveyances that are deemed fraudulent in law. As stated in *Gendron v. Chicago & N.W. Transp. Co.*, 139 Ill.2d 422, 438, 151 Ill.Dec. 545, 553, 564 N.E.2d 1207, 1215 (1990):

> In order to establish that a conveyance is fraudulent in law, three elements must be present: (1) there must be a conveyance made for no or inadequate consideration; (2) there must be an existing or contemplated indebtedness against the transferor; and (3) it must appear that the transferor did not retain sufficient property to pay his indebtedness.

■■ 6. For fraudulent conveyance purposes, the United States is of course a creditor as to any unpaid tax liabilities. Such liabilities become due and owing on the date that the returns are required to be filed and not on the date of assessment (*Indiana Nat'l Bank v. Gamble*, 612 F.Supp. 1272, 1276 (N.D.Ill.1984); *Kitsos*, 770 F.Supp. at 1234–35). Indeed, for purposes of a fraudulent conveyance action a "creditor" becomes such when its claim arises, even if its claim is contingent and regardless of the fact that the claim has not matured or been reduced to judgment until after the conveyance (*Menconi v. Davison*, 80 Ill.App.2d 1, 4–5, 225 N.E.2d 139, 141–42 (1st Dist.1967); and see I.L.P. § 133, at 451).

■ 7. Assessments of tax liabilities as evidenced by IRS Forms 4340 are presumed to be correct. It is the taxpayer's burden to overcome that presumption by persuading the finder of fact by a preponderance of the evidence that the assessment is incorrect (*United States v. Dixon*, 672 F.Supp. 503, 507 (M.D.Ala.1987), *aff'd mem.*, 849 F.2d 1478 (11th Cir.1988)). No such proof was offered by Therese, and this Court concludes that the amounts set out in Findings 34 and 36 (together with then-accrued interest) were due and owing from Edward to the United States on September 8, 1984.

■ 8. In this instance the weight of the credible evidence leads to the conclusion that the transfer to Therese took place in September 1984 and not earlier. That transfer was fraudulent both in fact (because the circumstances show that Edward's intent was to prevent the United States, and perhaps other creditors, from collecting a just debt (*Till v. Till*, 87 Ill.App.2d 358, 361, 231 N.E.2d 641, 643 (1st Dist.1967)) and in law (because all three factors set out in *Gendron* were unquestionably present). In light of Edward's fraudulent intent and Therese's knowledge of the circumstances (see *Alan Drey Co. v. Generation, Inc.*, 22 Ill.App.3d 611, 317 N.E.2d 673, 680 (1st Dist.1974)), the transfer must be set aside in full even if Therese were considered to have contributed some value to the Graceland Property at the time of acquisition or during the period of its ownership (*Svalina v. Saravana*, 341 Ill. 236, 250, 173 N.E. 281, 286 (1930); *Cook v. Tedrick*, 338 Ill.App. 573, 579, 88 N.E.2d 515, 518 (4th Dist.1949)).

9. In this instance the transfer involved the beneficial interest in an Illinois land trust, a real estate title-holding arrangement in which the only attribute of ownership that the beneficiary does not have is title (*In re Gladstone Glen*, 628 F.2d 1015, 1018 (7th Cir.1980)), retaining absolute control of the management and receiving all the earnings, avails and proceeds of the real estate (*People v. Chicago Title & Trust Co.*, 75 Ill.2d 479, 485–86, 27 Ill.Dec. 476, 478, 389 N.E.2d 540, 542 (1979)).

■ 10. Because the assignee of a beneficial interest in an Illinois land trust acquires all of the assignor's interest in the transferred property and stands in the shoes of the assignor, the assignee takes the assignor's interest subject to all legal and equitable defenses existing at the time of the assignment (*Montgomery Ward & Co. v. Wetzel*, 98 Ill.App.3d 243, 248, 53 Ill.Dec. 366, 371, 423 N.E.2d 1170, 1175 (1st Dist.1981)).

■ 11. Here (as is true in every Illinois land trust with a bank or other institutional trustee) the specific terms of the Trust Agreement required any assignment of a beneficial interest to be lodged with the trustee, with the trustee's acceptance indicated thereon, before the assignment would become binding upon the trustee. In that situ-

ation the assignment is not considered completed until those two things take place (*St. Charles Sav. & Loan Ass'n v. Estate of Sundberg,* 150 Ill.App.3d 100, 107–08, 103 Ill.Dec. 301, 306, 501 N.E.2d 322, 327 (2d Dist.1986)). That being so, Therese as assignee did not acquire the status of a beneficiary of the trust until the assignment was lodged with and accepted by Bank on September 11, 1984 (*Larkin v. Bank of Ravenswood,* 91 Ill.App.3d 803, 805, 47 Ill.Dec. 290, 290, 415 N.E.2d 15, 16 (1st Dist.1980)).

■ 12. Any purported assignment by Edward to Therese of his beneficial interest in the Land Trust in April 1982, which claimed assignment was unquestionably not lodged with nor accepted by Bank as trustee, was never completed. Therese could not and did not acquire the status of a beneficiary under the Land Trust pursuant to any such assignment. In any event, any purported assignment by Edward to Therese of his beneficiary interest in the Land Trust in April 1982 would also have constituted a fraudulent conveyance under Illinois law as to the United States.

■ 13. As for the properly lodged and accepted assignment by Edward to Therese of his interest in the Land Trust (that in September 1984), for the reasons stated in these Conclusions that clearly constituted a fraudulent conveyance under Illinois law as to the United States. That being the case, it has long been established that a court of equity will follow the property into the hands of the assignee and subject it to the payment of the assignor's debt (*Coale v. Moline Plow Co.,* 134 Ill. 350, 358, 25 N.E. 1016, 1018 (1890). In that event the assignee is liable to the assignor's creditors for the value of the property and will be held to account for any money received on its sale (*id.; Best v. Fuller & Fuller Co.,* 185 Ill. 43, 51, 56 N.E. 1077, 1079 (1900) (per curiam)).

14. Therese, having knowledge of at least $274,820 owed by Brown to the United States before Therese entered into a contract to sell the Graceland Property, and also having knowledge that Edward had owned (and that his Estate owned) no other assets with which to satisfy that liability, was a fraudulent grantee. Therese therefore held the Grace-

land Property in trust for the benefit of the United States and is personally liable to the United States to the extent of the net proceeds of $105,709.70 that she received from the sale of that property on November 19, 1985, plus interest on that sum until paid to the United States.

\* \* \*

It is hereby ordered that judgment shall be entered in favor of the United States and against Therese Brown in the amount of $105,709.70, plus interest on that amount at the rate of 5% per annum from November 19, 1985 (the date of her sale of the Graceland Property) to the date of judgment.